## AYCOCK v. BRADBURY.
### No. 1154.

Circuit Court of Appeals, Tenth Circuit.
April 24, 1935.

McDERMOTT, Circuit Judge, dissenting.

John Barry, of Oklahoma City, Okl. (Howard Patton, of Woodward, Okl., on the brief), for appellant.

Warren K. Snyder, of Oklahoma City, Okl. (H. B. King, of Woodward, Okl., on the brief), for appellee.

Before PHILLIPS, McDERMOTT, and BRATTON, Circuit Judges.

BRATTON, Circuit Judge.

This action presents for determination the validity of a transfer of certain assets of a national bank made during the last business day preceding its suspension of business.

The First National Bank of Woodward, Okl., closed its doors on Monday, January 18, 1932, at about 10 o'clock in the forenoon and was subsequently placed in the hands of a receiver. It had been insolvent since September 28th preceding. It was examined by a national bank examiner on that day; his report reflected an insolvent condition, and in consequence an assessment of 100 per cent. was levied against the holders of stock, payable January 26, 1932. The officers of the bank exerted a desperate effort to have the assessment withdrawn or modified. During December and January they appealed to their Senators and Representative in Congress to aid them in that behalf. The president of the bank stated in one letter relating to the matter that it was impossible to pay the assessment and that unless it was withdrawn or modified the bank would have to close.

The bank was depositary of the city of Woodward and, as such, had on deposit about $145,000. It gave a bond of $25,000 as security for that account with the United States Fidelity & Guaranty Company as surety, which by its terms expired December 31, 1931. Late in December the bank advised the city that arrangements had been made to renew the bond, and early in January it stated that the premium had been paid and that the cause of the delay in receiving the renewal was unknown. A few days later the city learned through telegraphic correspondence with the surety company that the bond had not been renewed, but, on the contrary, had lapsed at the maturity date. After receiving that information, the city officials called at the bank on January 11th and demanded the cash or security. The officers of the bank stated that they did not know what could be done about the matter and were told that the city treasurer would draw a check for the amount of the lapsed bond. Thereupon they stated that it would do no good; that the bank did not have the money with which to pay it; and that it would result in closing the bank. It was then agreed that the bank should assign to the city certain securities held by the surety company as indemnity against loss on the bond. A written assignment was executed the following day, but the securities were never delivered pursuant to its terms. An application dated January 15th was submitted to the Federal Reserve Bank for a rediscount of $7,026.50. The rediscount was never accepted, but the bank prematurely took credit for the amount and carried it on its books as a part of its cash and sight exchange. An effort was made to borrow $7,500 from the Commerce Trust Company of Kansas City on a note dated the 16th, secured by practically all the unpledged municipal securities the bank possessed, but the loan was not made. According to the books, the bank had cash on hand January 15th, 16th, and 18th in the sum of $13,733.72, $16,921, and $12,639.91, respectively. The cashier transferred his property on December 26th because the president refused to protect him against the assessment upon his stock. The president had an overdraft of $948.50 on December 28th. It was increased on January 11th to $1,039.35, and on the 16th he withdrew $500 which was returned after bank closed.

The defendant was a dealer in produce and had been a customer of the bank for more than twenty years. His account was an active one and his balance on deposit often reached the range of $25,000. On Friday, January 15th, his balance was $25,092.78 and on Saturday it was reduced to $2,507.91. Three checks given to his son, a dealer in produce in a nearby town, in the respective sums of $1,750, $1,366, and $1,070.91, were cashed on that day; also one for $4,500 to Renfrow Investment Company in payment of a personal note secured by a real estate mortgage. Defendant was told that the note and mortgage were in Chicago and that it would require a few days to obtain them. Despite that fact he gave the check and requested a receipt for the money until they arrived. On the same day he went to the bank, told the cashier that he had a substantial amount of idle money, and expressed a desire to invest some of it in Liberty bonds. The cashier stated that the bank did not have any Liberty bonds; that it would be hard on the bank if the deposit were drawn out in cash, and suggested that defendant invest in some notes and warrants which the bank owned. Defendant asked if they were good and was told that he could select them. The president consulted the attorney for the bank in

the presence of the defendant, for the stated purpose of ascertaining whether assets could be sold or pledged when there was a threatened or attempted run on the bank. The attorney advised that it could be done in certain circumstances, but suggested that action be deferred until he supplied a written opinion. The opinion was furnished later in the day, in which it was stated that assets could be transferred if the bank was solvent and the transfer was not made in contemplation of insolvency with a view to creating a preference. The cashier then submitted the note case of the bank to the defendant and he selected thirty-five promissory notes for the aggregate amount of $8,855.18, also thirty-one warrants for the aggregate sum of $4,491.38, and drew his check on the bank for $13,346.56 in payment of them. The notes varied in amount from $13 to $2,000, many of them being for less than $100. The warrants varied from $2 to $1,464.50, many of them being for less than $20.

The receiver sought to recover the securities, alleging that prior to their transfer the bank had committed an act of insolvency and that such transfer was made in contemplation of insolvency with a view to creating a preference. Defendant denied that an act of insolvency had been committed; denied that the transfer was made in contemplation of insolvency with a view to preferring him; and alleged that it was a bona fide transaction for the sale and purchase of the securities.

A jury was waived and the case tried to the court. At the conclusion of the testimony each party submitted an appropriate motion for judgment in his favor. The court filed a written opinion in which the issues of fact and law were found for defendant. Plaintiff thereafter presented an application to reopen the case and allow him to submit additional evidence. An affidavit was attached thereto and certain testimony was taken in support of the application. The application was denied and judgment rendered for defendant.

The finding of a court in a case at law in which trial by jury has been waived is equivalent to a verdict and will not be disturbed on appeal if it is supported by substantial evidence. But whether there is substantial evidence to support a finding is a question of law which may be reviewed.

Section 52 of the National Bank Act of 1864, now 12 USCA § 91, provides:

"All transfers of the notes, bonds, bills of exchange, or other evidences of debt owing to any national banking association, or of deposits to its credit; all assignments of mortgages, sureties on real estate, or of judgments or decrees in its favor; all deposits of money, bullion, or other valuable thing for its use, or for the use of any of its shareholders or creditors; and all payments of money to either, made after the commission of an act of insolvency, or in contemplation thereof, made with a view to prevent the application of its assets in the manner prescribed by this chapter, or with a view to the preference of one creditor to another, except in payment of its circulating notes, shall be utterly null and void; and no attachment, injunction or execution, shall be issued against such association or its property before final judgment in any suit, action, or proceeding, in any State, county, or municipal court."

The object of the statute is plain. It is to prevent a bank from preferring one creditor over others after the commission of an act of insolvency or in contemplation of insolvency. The act contemplates ratable distribution of the assets of an insolvent bank among its several creditors and the particular provision in question is in furtherance of that purpose. Insolvency of a bank within the meaning of the statute is inability to meet its obligations as they accrue in the ordinary course of business. Federal Intermediate Credit Bank v. L'Herisson (C. C. A.) 33 F.(2d) 841. We think the declared inability of the bank to pay the check for the city funds no longer protected by bond was an act of insolvency. The city officials stated that the check would be drawn. The bank did not respond that it lacked sufficient cash at the moment and that a short time would be required to arrange for payment. Instead, it announced unconditionally that it was useless to draw and present the check; that it did not have the money with which to honor it; and that its drawal and presentation would result in closing the bank. That caused the city to withhold the futile ceremony of presenting the check and was equivalent to a refusal to pay an obligation when it accrued—a plain act of insolvency.

Passing that feature of the case and addressing ourselves to the contention that the transfer was made in contemplation of insolvency and with a view to creating a preference, every act occurring after a bank

becomes insolvent is not subject to challenge. Transactions taking place in the ordinary course of business, such as payment of a check in the usual manner at a teller's window without knowledge on the part of the customer that the bank is insolvent, cannot be assailed in a suit brought under the provisions of the statute. McDonald v. Chemical Nat. Bank, 174 U. S. 610, 19 S. Ct. 787, 43 L. Ed. 1106; Rucker v. Kokrda (C. C. A.) 68 F.(2d) 73. But this transaction was not made in the ordinary course of business. The term "ordinary course of business" in its application to banking means receiving deposits, paying withdrawals, making loans, and discounting commercial paper. Placing the note case before a depositor for the purpose of selecting choice securities in lieu of his deposit bears no similarity to the cashing of a check at the teller's window or other ordinary act occurring in the course of the day. It is an unusual transaction not in the ordinary channels of business. Compare Roberts v. Hill (C. C.) 24 F. 571; First National Bank v. Andresen (C. C. A.) 57 F.(2d) 17; Varden v. City of Corbin (D. C.) 2 F. Supp. 840.

■ It is settled law that a bank is in contemplation of insolvency when the fact becomes reasonably apparent to its officers that it will presently be unable to meet its obligations as they accrue and pay its creditors in full; and realization of that fact cannot be deferred by blindly indulging in hope without reasonable basis of fact. Roberts v. Hill, supra; Brill v. McInnes (C. C. A.) 14 F.(2d) 306; Parks v. Knapp (C. C. A.) 29 F.(2d) 547; First Nat. Bank v. Andresen, supra. That this transfer was made in contemplation of insolvency seems beyond question. The court expressly found that the bank had been insolvent since the preceding September; that the examiner so determined; and that his determination evoked the assessment. The officers of the bank put forward every effort at their command to secure withdrawal or modification of the assessment; the president stated in writing that it could not be paid and unless withdrawn or modified would result in closing the bank. Despite that statement the comptroller of the currency steadfastly refused to withdraw or modify it, and the bank was so advised. The cashier transferred his property about three weeks before the bank closed to escape its payment. The president was overdrawn and withdrew $500 in currency on the day the transfer in question was made. Credit was prematurely taken for the rediscount on the day preceding the transfer and the sum was irregularly carried in the cash and sight exchange. A vain effort was made to secure a small loan from a bank in Kansas City. The cash on hand was insufficient to pay defendant's deposit. The president of the bank, in the presence of the defendant and in the course of the negotiations for the transfer, sought legal advice as to whether such a transfer could be made when there was an attempted or threatened run; and the bank was open for business less than four hours after the transaction was consummated. These undisputed facts establish conclusively that the transfer was made in contemplation of insolvency and an intention to prefer will be presumed where assets are transferred to a depositor at a time when the officers know that the bank is insolvent and cannot pay its obligations in full as they accrue because that is the natural and probable consequence of such a transaction and every person is presumed to intend such consequence of his own acts. Federal Reserve Bank v. Omaha Nat. Bank (C. C. A.) 45 F.(2d) 511; First Nat. Bank v. Andresen, supra; Browne v. Stronach (D. C.) 7 F.(2d) 685.

■ Stress is laid upon the contention that the defendant did not know of the bank's insolvency and that he acted in good faith. His knowledge or the lack of it is immaterial. If the transfer was made in contemplation of insolvency and with a view to creating a preference, it was void quite apart from his knowledge of the insolvent condition of the bank. The statute makes it so. National Security Bank v. Butler, 129 U. S. 223, 9 S. Ct. 281, 32 L. Ed. 682; Ball v. German Bank (C. C. A.) 187 F. 750; First Nat. Bank v. Andresen, supra. We fail to find any substantial evidence in the record to support the finding and judgment.

For the reasons indicated, the judgment is reversed and the cause remanded for further proceedings not inconsistent with this opinion.

Reversed and remanded.

McDERMOTT, Circuit Judge (dissenting).

Three reasons prevent me from concurring in the opinion of the majority. I set them down, confessing some doubt as to their soundness.

1. There is something manifestly wrong with a situation where a hopelessly insol-

vent bank is permitted to remain open, receiving deposits, for months after its insolvency is found to exist, and for days after its president had written that "it was impossible to pay the assessment and that unless it was withdrawn or modified the bank would have to close"—to quote the language of the majority opinion—and then to permit its receiver to recover from a depositor on the ground that the bank was known to be hopelessly insolvent while he was depositing his money.

Note this: During the period when the Comptroller and the bank officials knew the bank's condition was hopeless, as they now say, Mr. Bradbury deposited $70,322.80 of honest, hard-earned money. Leaving the bank open was an invitation to him to deposit this money coupled with an assurance by the Comptroller that the bank was solvent to the best of his knowledge and belief. Having induced him to make these deposits by this assurance, the Comptroller recovers $13,346.56 from Bradbury upon proof that the assurance given Bradbury was false, and known to be false, all the while. Bradbury knew nothing of the city's unsuccessful effort to get its money out. He relied, as depositors generally rely, upon the fact that banks are regularly examined, and if left open, will repay deposits on demand.

I realize that a Comptroller is often faced with a serious dilemma; if a bank is closed the moment it is found to be insolvent, depositors and communities suffer irreparable losses. If it is kept open a while, those losses may be averted by stock assessments or by consolidations or by getting in new capital and new management. There is a value to bank deposits, not shown on the books, which is irretrievably lost when the bank is closed but which may be salvaged if left open. I do not criticize the Comptroller, charged with such heavy responsibilities, when he leaves a bank open in an effort to avert a calamity to a community and to salvage for the depositors the intangible good will of a going concern, even if later events prove his hope to have been groundless. But it does seem to me that he ought to be estopped to set up affirmatively as a ground of recovery, against a depositor who has deposited money relying upon the assurance of solvency implied by the open doors of the bank, that the assurance was false. Bradbury got back $13,-000 of securities on January 16th; he had deposited $70,000 after the bank was known by the Comptroller to be insolvent. Why should the Comptroller be permitted to assert, as a ground of recovery, that the assurance given when the money was deposited, was false and known by him to be false? The ordinary rules of estoppel would prevent an individual from thus playing fast and loose with his neighbor to his detriment. Why such a rule should not operate against a bank receiver, I do not know.

2. I agree that it is not an ordinary bank transaction to permit a depositor to select securities from the note case. The statute voids such transactions if made with a view to prefer a depositor or to prevent a ratable distribution of its assets. Judge Vaught's general finding amounts to a finding that this transfer was not made for such a purpose. Probably the real purpose was to satisfy a depositor with the hope that a failure might in some way be averted. The majority hold, and I agree, that where the necessary result is a preference, its effect cannot be avoided by a mere assertion of a contrary purpose. The majority hold that the proof is conclusive that the bank's condition was then beyond hope, for if there were any reasonable prospect of restoring its solvency, it could hardly be said, as a matter of law, that the bank intended to prefer Bradbury. If its condition was then hopeless, why didn't the Comptroller close it? Why was it left open until a run closed it two days later? The Comptroller was in close touch with the situation; he knew, better than we, whether there remained a fair chance of saving the bank by consolidation, new capital, or a sale. We ought to assume, in the absence of contrary evidence, that he did his duty, for that presumption attaches to the acts of public officers. Unless there was such a reasonable prospect, the Comptroller was in duty bound to close the bank, and not let depositors continue to deposit their savings therein. On this record, and with a general finding of a trial court, I cannot ascribe to the Comptroller the gross dereliction of inviting deposits in a bank when he knew there was no shadow of a hope of repaying them. If there was such a prospect, then we cannot say, as a matter of law, that the bank's intent was to prefer Bradbury; without that intent, the transfer is not voided by the statute.

3. The Comptroller, his counsel advises us, has acquiesced in the decision of the Second Circuit Court of Appeals in Nelson v. Lewis, 73 F.(2d) 521. There a bank was insolvent, although the Comptroller

and none of its officers except its cashier, knew it. There a depositor asked for his money and was told that the bank could not pay his check. There the depositor took securities for his balance. The Circuit Court of Appeals held the transaction was in the ordinary course of business and unassailable. The rights of a depositor in a national bank in Oklahoma ought to be the same as the rights of a depositor in a national bank in New York. While it seems to me that taking securities instead of cash for a deposit is not done in the ordinary course of banking business, yet that is the law in the Second Circuit; it ought to be the law as to all national banks until the Supreme Court says to the contrary.