In the Matter of James J. WHITE, Debtor,

v.

BOARD OF TRADE OF the CITY OF CHICAGO, Appellant.

No. 73–1614.

United States Court of Appeals, Seventh Circuit.

Argued Jan. 23, 1974.

Decided March 1, 1974.

John L. Bordes, Philip F. Johnson, John H. Stassen, Chicago, Ill., for appellant.

Norman H. Nachman, Gerald F. Munitz, Roy D. Grunnet, Chicago, Ill., for debtor.

Before SWYGERT, Chief Judge, and PELL and SPRECHER, Circuit Judges.

SPRECHER, Circuit Judge.

This appeal seeks to determine the right of the debtor's receiver to the proceeds derived from the sale of the debtor's membership in the Board of Trade of the City of Chicago.

I

James J. White, the debtor in possession, was a member of the Chicago Board of Trade from June 20, 1969 to March 24, 1970. White voluntarily sold and transferred his membership to a qualified purchaser on March 24, 1970 for $38,000, which amount the transferee deposited with the Secretary of the Board of Trade in accordance with the exchange's Rule 110, which provides in pertinent part:

> *Transfer of Membership.* Membership in this Association is a personal privilege, not subject to transfer except as herein authorized. When a member wishes to transfer his membership, he shall sign an offer to transfer, in such form as shall be prescribed by the Board. If a purchaser, elected to membership, accepts the offer, the transfer shall be consummated upon the deposit of the purchase price with the Secretary by the purchaser and the payment by the purchaser to the Association of a transfer fee.

> \* \* \* \* \* \*

> After the membership has been thus transferred, the Secretary shall immediately post the name of the seller upon the bulletin board and shall, within fifteen days, notify the Membership of the transfer. The Secretary shall hold the proceeds of the membership for a minimum period of ten business days after such notification to the Membership, during which period claims may be filed in accordance with Rule 113.[1]

Two members filed timely claims against the proceeds of the sale. On April 3, 1970, Orvis Brothers & Co. filed a claim in the amount of $171,801 arising from the sale to White of shares of stock of the Telex Corporation. On April 7, 1970, Ford Ferguson filed a claim for $100,000 arising from a loan to White for the purchase of shares of stock of Consumer Plus Technical Industries, Incorporated. Neither of the

---

1. Rule 113 provides that "A member to establish his claim and to become entitled to his rights under Rule 112 of this Chapter to share in the proceeds of a membership, shall file a statement of his claim during the period specified in Rule 110. Claims if not so filed and allowed by the Board may be paid out of any surplus after all other claims allowed by the Board have been paid in full and shall be paid in preference to claims [of the seller's partners] referred to in Rule 114 of this Chapter."

transactions underlying the claims were effected through the Board of Trade.

On April 2, 1970, an involuntary petition in bankruptcy was filed against White. On May 27, 1970, White filed a petition for an arrangement under Chapter XI of the Bankruptcy Act. 11 U.S.C. § 721. In the course of the arrangement proceeding, White filed an application for a turnover order against the Board of Trade praying that the proceeds of the sale of the membership be adjudged an asset of the estate.

Under the exchange's Rule 112, proceeds of the sale of a membership are to be applied to the transferor's indebtedness as follows:

> *"Proceeds of Membership.* Upon any transfer of membership, whether made by a member voluntarily or by the Board, the proceeds thereof shall be applied to the following purposes and in the following order of priority, viz:

> *"First.* The payment of all dues, fines, contributions, and charges payable to the Association by the member whose membership is transferred, and all indebtedness of such member thereto and to the Gratuity Fund;

> *"Second.* Payment of all dues, fines, assessments and charges payable by such member to the Clearing House and all indebtedness of such member thereto;

> *"Third.* The payment to creditors, who are members of the Association or who are registered corporations or partnerships under Rule 226, of all filed claims arising from Members' Contracts if and to the extent that the same shall be determined by the Board to have arisen out of contracts had between the parties thereto in the ordinary course of business, and shall have been allowed by the Board.

> *"Fourth.* If the proceeds of a transfer of membership are insufficient to pay all filed claims arising out of contracts allowed by the Board, such claims shall be paid pro rata, ex-

cept as provided in Rules 113 and 114 of this Chapter;

> *"Fifth.* The surplus, if any, of said proceeds shall be paid to the person whose membership is transferred or to his legal representatives upon the execution by him or them of a release or releases satisfactory to the Board."

The Board of Trade took the position that the two claims filed in this case against the proceeds of the sale of White's membership fell within the third category and arose from "Members' Contracts" which are further defined in Exchange Rule 16 as:

> "All contracts of members of the Association or of firms or corporations registered under the Rules and Regulations, with other members of the Association, or firms or corporations registered under the Rules and Regulations, for the purchase or sale of commodities, or for the purchase, sale, borrowing, loaning or hypothecation of securities, or for the borrowing, loaning or payment of money, whether occurring upon the floor of the Exchange or elsewhere. . . ."

On July 11, 1972, the Referee in Bankruptcy sustained the turnover application on the basis that the "rules of the Board of Trade cannot govern transactions which did not occur on the Board of Trade."

The Board of Trade filed a petition for review of the Referee's order in the district court on July 20, 1972. The district court by order and memorandum opinion of April 30, 1973 affirmed the Referee's order, holding that:

> "[A]n exchange may not confer a preference in the proceeds from the sale of a bankrupt's membership to members-creditors if the claims of the member-creditors did not arise as a result of transactions on the exchange.
>
> . . .
>
> \* \* \* \* \* \*
>
> ". . . To the extent that the claims of the member relate to transactions on the exchange, then Hyde v.

Woods allows such a preference in the proceeds realized from the sale of the membership. To the extent that they involve indebtedness owed by one member to another who becomes bankrupt, the *Middleton* decisions of the Third Circuit hold that other members may not, by virtue of exchange rules, be given a preference in them."

II

The district court, the Referee and the parties agree that the proceeds of the sale of a board membership are subject to the claims of members arising as a result of transactions which occurred on the exchange. Board of Trade of City of Chicago v. Johnson, 264 U.S. 1, 15, 44 S.Ct. 232, 68 L.Ed. 533 (1924). The opinion of this court in the *Johnson* case makes it clear that the transactions involved there occurred on the exchange. Board of Trade of City of Chicago v. Johnson, 283 F. 374, 377 (7th Cir. 1922).[2]

The Supreme Court held in *Johnson* that transactions on the exchange, at least, are liens "inherent in the property [seat on the exchange or the proceeds of its sale] in its creation" and "these must be satisfied before the trustee can realize anything on the transfer of the seat for the general estate." 264 U.S. at 15, 44 S.Ct. at 236. The *Johnson* case also establishes that the balance of the proceeds, after the payment of proper liens, is property of the bankrupt estate.

The controversy here is whether the rules of the Chicago Board of Trade can or do create proper liens against the proceeds even though arising from transactions with fellow-members which did not occur on the exchange.

In addition to *Johnson,* the Supreme Court adjudicated the respective claims of a bankrupt estate (asserted through a trustee or assignee in bankruptcy) and of member-claimants to the proceeds of an exchange seat in Hyde v. Woods, 94 U.S. 523, 24 L.Ed. 264 (1876). The Court did not discuss nor distinguish transactions on or off the exchange and it is not clear what type of transaction was involved.[3]

However, *Hyde* and *Johnson* both make it clear that the liens are the creation of the exchange rules in effect at the time the seat was purchased. In *Hyde,* the Court said that "[t]here is no reason why the stock board should not make membership subject to the rule in question . . . ."[4]

In *Johnson,* the Court interpreted the exchange rule to draw its intent. 264

2. "Whether Henderson traded on the Board's exchange for his personal account does not appear, but he did not leave personal debts to other members growing out of trades on the exchange. Being an executive officer of Lipsey & Co., a corporation, he did make trades on the exchange for that corporation. Lipsey & Co. is insolvent, but not in bankruptcy, and its creditors, who became such through unsettled trades made for it on the exchange by Henderson, are here, as the Board's coappellants, contesting the trustee's rights."

3. In *Hyde,* the Court said that a person could no longer be a member when "a member fails to perform his contracts" which could possibly be construed as "contracts qua member" or relating to exchange transactions (94 U.S. at 524), but the language is not that clear.

4. "There is no reason why the stock board should not make membership subject to the rule in question, unless it be that it is a violation of some statute, or of some principle of public policy. It does not violate the provision of the bankrupt law against preference of creditors, for such a preference is only void when made within four months previous to the commencement of the bankrupt proceedings. Neither the bankrupt law nor any principle of morals is violated by this provision, so far as we can see. A seat in this board is not a matter of absolute purchase. Though we have said it is property, it is incumbered with conditions when purchased, without which it could not be obtained. It never was free from the conditions of article 15, neither when Fenn bought, nor at any time before or since. That rule entered into and became an incident of the property when it was created, and remains a part of it into whose hands soever it may come. As the creators of this right—this property—took nothing from any man's creditors when they created it, no wrong was done to any creditor by the imposition of this condition." 94 U.S. at 525.

U.S. at 14–15, 44 S.Ct. 232. Upon doing so here, we find it unnecessary to reach the issue of whether the preference provisions or policies of the Bankruptcy Act prohibit an exchange rule which purports to affect transactions not arising on the exchange. We conclude that the Chicago Board of Trade rules at issue here were not intended to reach such transactions.

### III

Rule 112 applies by its terms only to claims arising out of contracts "in the ordinary course of business" and which "shall have been allowed by the Board."

Seldom are the words "in the ordinary course of business" intended to mean in the ordinary course of *any* business. They usually take on the coloration of their context.

For example, the National Bank Act contains a provision to prevent national banks from creating preferences in contemplation of their failure. 12 U.S.C. § 91. Transactions taking place in the ordinary course of business are not voidable under the statute. Mechanics Universal Joint Co. v. Culhane, 299 U.S. 51, 56, 57 S.Ct. 81, 81 L.Ed. 33 (1936). The phrase is construed very narrowly however. "The term 'ordinary course of business' in its application to banking means receiving deposits, paying withdrawals, making loans, and discounting commercial paper." Aycock v. Bradbury, 77 F.2d 14, 17 (10th Cir. 1935). A bank properly engages in a host of business transactions other than in the strict banking business, to which the preference—avoidance statute is fully applicable.

Another example is § 9–307 of the Uniform Commercial Code which provides that a buyer in the ordinary course of business takes free of a security interest created by his seller even though the security interest is perfected and the buyer knows of its existence. Under the Code the buyer, in order to avail himself of that protection, must buy in ordinary course from a person in the business of selling goods "of that kind." UCC, § 1–201(9). The comment to the last section states that a pawnbroker cannot be a buyer in the ordinary course of business because he does not buy from a person engaged in selling goods of that kind.

■ The intent of the Board of Trade in providing for the distribution of the proceeds realized upon the sale or transfer of a membership must be derived from the language used in Rule 112, as further defined in Rule 16.

■ Rule 112 provides first for the payment of dues, fines, contributions, charges and indebtedness payable to the association. It provides second for the payment of dues, fines, contributions, charges and indebtedness payable to the Clearing House. It provides third for

> "The payment to creditors, who are members of the Association . . . of all filed claims arising from Members' Contracts if and to the extent that the same shall be determined by the Board to have arisen out of contracts had between the parties thereto in the ordinary course of business, and shall have been allowed by the Board; . . ."

The Board of Trade has acknowledged in its brief on appeal that the rule does not comprehend "a tort claim, gambling debt or personal advance," but it contended that the two claims at issue were incurred in the ordinary course of business. The question is in the ordinary course of what business? The business of White or the business of Orvis Brothers & Co. or the business of Ferguson or any business?

In Seattle Curb Exchange v. Knight, 59 F.2d 39 (9th Cir. 1932), the court adjudicated a dispute over the proceeds of the sale of a seat of a bankrupt on the Seattle Curb Exchange between the trustee in bankruptcy and a fellow-member of the exchange whose claim arose out of an employment contract. The

rule there analogous to Rule 112 (Third) here read

> "The payment of creditors who are members of the Exchange . . . of all filed claims arising from contracts subject to the rules of the Exchange, if, and to the extent that, the same shall be allowed by the Committee on Membership."

However a rule there substantially similar to Rule 16 here defined contracts "subject to the rules of the Exchange" as those with members "for the purchase, sale, borrowing, loaning or hypothecation of securities, or for the borrowing, loaning or payment of money, whether occurring upon the floor of the Exchange or elsewhere." It was contended that the "payment of money" covered the employment contract claim but the court said at 42:

> "We do not think that the by-law was intended to cover the contracts of employment by broker, or member, although the employee is also a member. The rights of the Exchange to establish rules of priority of payment for obligations arising in connection with the business it conducts must be limited by the scope and purpose of the organization as well as by the language used in its by-laws. Its power to make rules governing the obligations and rights of its members in contravention of the general law on the subject must be strictly limited to the field legitimately covered by the scope of its business." [5]

In the present case, the allowable claims must arise from "Members' Contracts . . . in the ordinary course of business." The "business" intended is the members' joint business conducted on the board of trade. The kinds of business itemized in Rule 16 could be carried on in connection with Members' Contracts arising out of transactions occurring on the board of trade and obviously those kinds of business could occur upon the floor of the exchange or elsewhere. In order to consummate an exchange transaction, any of the Rule 16 functions could be employed.

This interpretation is fortified by the second crucial phrase of Rule 112 (Third), that is, claims arising from "Members' Contracts . . . [which] shall have been allowed by the Board." The board could not have intended to become engaged in the general arbitration or claim-determination business whereas it has a strong right and a superior expertise to determine and allow or disallow claims arising out of transactions occurring on its own exchange.

We conclude that the two claims against the proceeds of White's membership involved in this appeal, which concededly "did not result from Board of Trade transactions" (Board's Reply Brief, 2), do not fall within the application of Rule 112 inasmuch as that rule was not intended to cover transactions not occurring on the exchange.

The judgment order affirming the Referee's turnover order and denying the Board's petition for review is affirmed.

Affirmed.

PELL, *Circuit Judge* (dissenting).

The majority opinion finds it unnecessary to "reach the issue of whether the preference provisions or policies of the Bankruptcy Act prohibit an exchange rule which purports to affect transactions not arising on the exchange" because "the Chicago Board of Trade rules at issue here were not intended to reach such transactions." I find nothing in the meager record before us to justify this conclusion. I therefore respectfully dissent.

If we are to decide this case on the basis of the transactions that the rules were "intended" to reach, then it appears to me that we should accord almost controlling significance to the interpretation that the promulgating or-

---

5. See also, Middleton v. Fidelity-Philadelphia Trust Co., 35 F.2d 851 (3rd Cir. 1929) and Middleton v. Dussoulas, 35 F.2d 857 (3rd Cir. 1929).

ganization or institution places on those rules. It is clear that the Board of Trade does interpret the rules in question here to include business transactions between members whether or not those transactions occur as a part of normal Board business.

I have qualified the significance to be given to the Board's interpretation by characterizing it as "almost controlling." Under well-settled rules of construction, if only one meaning can be given to the words of a written instrument because of their plain intendment, because of established custom or usage, or because they are words of art, then an interpretation by the Board inconsistent with unambiguous contractual provisions cannot prevail. It appears to me, therefore, that there is implicit in the majority opinion a holding that the wording is not ambiguous and is susceptible only to a meaning inconsistent with the Board of Trade's interpretation.

I am unable to accept this result for two reasons. In the first place, it appears to me that the rules in question unambiguously do relate to all business transactions between members. Under the rules, these transactions may occur "elsewhere" than on the floor of the Board. Further, they are not confined to commodities, which is the business of the Board of Trade, but may involve the purchase and sale of securities, not the business of the Board, or the borrowing, lending, or payment of money. The claims of the creditors-members here arose from the sale of certain securities and the loan of $100,000 for the purchase of other securities.

The rationale of this interpretation is obvious. Members of the Board of Trade may, and from this case obviously do, engage in transactions with each other other than those occurring in the ordinary course of business of the Board. The lien on the proceeds of the sale of a member's seat is a protective device assuring stability and confidence in *all* business transactions between members.

Secondly, even if it is assumed *arguendo* that there is some ambiguity, then it appears to me that, in the absence of a sufficient record to determine just what the promulgating party "intended," there should be a remand for a hearing to ferret out those matters not now in the record which customarily enable the trier of fact to ascertain what that intention was. Thus, although I am unable to state precisely what form the evidence might take, it would seem to be significant if the interpretation now advanced by the Board had been historically a matter of custom and usage. Acquaintanceship and understanding on the part of Board members with the interpretation, particularly at the time they purchased their seats, would be of considerable import. If Board members have, in fact, been relying on the Board's interpretation, our "bolt from the blue" may seriously disrupt their credit arrangements. The property rights at stake are too substantial and the impact of a construction of the rules by this court too great for us to decide the case on the basis of possibly inaccurate assumptions as to what the rules "intended," particularly when those assumptions are at odds with the interpretation of the organization issuing the rules.

Further, the Board of Trade, whose members are in the commercial world, may at a hearing indicate that it does not share the concern expressed by the majority opinion about the prospect of engaging "in the general arbitration or claim-determination business." Again, this should be a matter of evidence, not an assumption, if the pertinent rules are ambiguous.

Before a remand, it would be necessary, of course, to meet the preference-bankruptcy question, which the majority does not address. In my opinion, there is no bankruptcy preference.

Although it may be "dusty law," as the district court described it, I have no cause for concluding that the reasoning of the Supreme Court in Hyde v. Woods,

94 U.S. 523, 24 L.Ed. 264 (1876), is other than currently good law:

"There is no reason why the stock board should not make membership subject to the rule in question, unless it be that it is a violation of some statute, or of some principle of public policy. It does not violate the provision of the bankrupt law against preference of creditors, for such a preference is only void when made within four months previous to the commencement of the bankrupt proceedings. Neither the bankrupt law nor any principle of morals is violated by this provision, so far as we can see. *A seat in this board is not a matter of absolute purchase. Though we have said it is property, it is encumbered with conditions when purchased, without which it could not be obtained. It is never free from the conditions* of article 15, neither when Fenn [the debtor] bought, nor at any time before or since. *That rule entered into and became an incident of the property when it was created,* and remains a part of it into whose hands soever it may come. As the creators of this right—this property—took nothing from any man's creditors when they created it, no wrong was done to any creditor by the imposition of this condition." 94 U.S. at 525. [Emphasis added.]

As the district court also observed: "Subsequent to the *Hyde* decision, the Bankruptcy Act of 1898 was passed which set out in some greater detail the standards regarding preferred creditors. However, this new bankruptcy law did not [a]ffect the holding of Hyde v. Woods as evidenced by the fact that it was discussed and reaffirmed in Board of Trade v. Johnson, 264 U.S. 1 [44 S.Ct. 232, 68 L.Ed. 533] (1924)."

For the reasons herein indicated, I would at the very least reverse and remand for a hearing to determine what the intention was as to the scope of the transactions included in the rules in question.