FEDERAL DEPOSIT INSURANCE CORPORATION, In its Capacity as Receiver of Century National Bank, Plaintiff–Appellant,

v.

Billy B. GOLDBERG, Defendant–Appellee.

No. 89–2390.

United States Court of Appeals, Fifth Circuit.

July 30, 1990.

Rehearing Denied Sept. 12, 1990.

198.57; in other words, they have sustained only about 36 percent of the August 13, 1988 judgment.

Sharon P. Silvertsen, Gregory E. Gore and Douglas W. Alexander, Washington, D.C., for Federal Deposit Ins. Corp.

Joseph A. Kornfeld and Robert A. Axelrad, Hiller, Kornfeld, Axelrad & Falik, Houston, Tex., for defendant-appellee.

Before GOLDBERG, GARWOOD and DAVIS, Circuit Judges.

GOLDBERG, Circuit Judge:

This is an action by the Federal Deposit Insurance Corp. ("FDIC"), as Receiver for Century National Bank ("CNB"), to collect on a $100,000 promissory note executed by Billy B. Goldberg ("Goldberg"), a principal shareholder and a past chairman of the failed institution. Goldberg defended this action on the ground that he had received a $100,000 credit on the note from CNB. He claimed that the credit arose from the rescission of a purchase of CNB stock. CNB's Board of Directors had voted to rescind the stock purchase and credit Goldberg's note only hours before the Office of the Comptroller of the Currency ("OCC") declared CNB insolvent, but the rescission and credit were never entered on the bank's books. The FDIC claimed, in response to this defense, that the Board's action was a transaction in contemplation of insolvency and therefore void pursuant to 12 U.S.C. § 91. Goldberg countered that he was entitled to the rescission because he had purchased the stock in reliance upon representations made by the OCC which had proven false, therefore, the rescission was *not* a transaction in contem-

plation of insolvency. The trial court agreed with Goldberg and held, as a matter of law, that the rescission was not a transaction in contemplation of insolvency and that Goldberg was entitled to a $100,000 credit against his loan. We disagree and now REVERSE.

The facts leading up to the litigation before us read like a script for the silent movie serial "The Perils of Pauline." Each installment of that series ended with Pauline tottering on the brink of some disaster from which she was always rescued, at the last possible moment, in the next episode. Every script had a hero and there was always a dastardly villain. In this case there are also narrow escapes and bold rescues. CNB is the damsel in distress and Appellee Goldberg would have us cast the OCC as the villain of the piece. Unfortunately for Goldberg, life doesn't always imitate art.

## I. FACTS

Goldberg was a founding investor and principal stockholder of Century National Bank in Houston, Texas.[1] It seems that the bank was from the start an ill-fated venture. In December of 1985, only a few years after it had opened, the bank was in financial trouble and required a substantial capital infusion to keep it going. In January of 1986, under pressure from the OCC, Goldberg and others injected $1 million of additional capital into CNB and a crisis was averted. Unfortunately for all concerned, this infusion bought the bank and its investors only temporary relief.

By September of that same year it became clear that the January infusion of additional capital had been insufficient. The Comptroller's office was concluding a lengthy audit of the bank which revealed serious problems and CNB was once more on the brink of closure. CNB was severely undercapitalized and the situation was getting worse daily. In fact, CNB was scheduled to be closed by the OCC on September 18, 1986 and a bid package on the bank had

---

1. At one point he also served on its Board of Directors. However, at all times relevant to this appeal he was neither a member of the Board, nor did he hold any office or official position at the bank.

been prepared for distribution the next day to potential buyers in Dallas.

Meanwhile, Goldberg was trying, once again, to arrange with the OCC a last minute rescue. On September 18, 1986, the OCC agreed to allow Goldberg and others to make another infusion of capital of approximately $470,000 in exchange for which the scheduled closing would be postponed. The OCC had calculated that $470,000 was the amount necessary to render the bank *temporarily* [2] solvent by covering the current regulatory shortfall. For long term stability, an additional $2.5 million was needed, but the $470,000 was put in to buy the bank some time to get this larger sum together.

On September 19th, in accordance with the plan outlined to the OCC, Goldberg and the other founding investor, Hill, each purchased fifty shares of CNB stock for $100,000. Goldberg raised his $100,000 contribution by cashing in a CNB Certificate of Deposit held in his wife's name. The remaining $270,000 was contributed by Century Development Corp., a company of which Goldberg was the managing partner. All of these transactions were duly recorded on CNB's books.

Thus was the imminent closure of CNB on September 18th forestalled. If CNB was the heroine tied to the railroad tracks, Goldberg was the hero who had snatched her out from under the very wheels of disaster. It was a dramatic rescue that did not escape the attention of the local media. Sadly, it proved to be a futile gesture; the OCC examiners discovered that the "shortfall" figure initially calculated was inaccurate because they had discovered certain accounts payable were not included in their calculations. As a result of adding these figures in, CNB was once more technically insolvent.[3]

On September 24th, the Board of Directors of CNB held a meeting at which Goldberg and representatives of the OCC were present. At this meeting OCC representative Michael Yeuenger informed the Board that the September 19th capital infusion had failed to cure CNB's insolvency and that closure was imminent. According to the minutes, Goldberg then proposed yet another rescue plan. He said he had located a potential investor in Florida, and he asked the OCC to delay any closing for thirty days so that he could have time to put together the plan. Yeuenger responded that immediate action was required to keep the bank open. The OCC representatives were then excused from the meeting and the Board discussed this new plan. Later, the OCC representatives were called back in and the plan was again presented to Yeuenger. He said he would not oppose the Board's pursuit of this latest effort, but that no more "bandaid" approaches would be acceptable to the OCC.

The Board met again on October 2, 1986, and at Goldberg's request,[4] rescinded the September 19th stock purchases. According to the minutes of that meeting, the Board directed that the proceeds from the rescission of the stock sale to Goldberg be credited to a $100,000 loan which he had outstanding at that time. The Deputy Director of the OCC was informed of this action and objected to it. In addition, both the Cashier and the President of the bank resigned rather than "book" the transaction. Therefore, this "credit" was never recorded on the bank's books. Later that

---

**2.** Goldberg testified that the OCC representative had told him he would "only have days" as a result of this latest investment. Tr. Trans. p. 48.

**3.** However, the record suggests that the public attention provoked a run on the bank. A run on the bank could itself guarantee that the stopgap plan worked out by Goldberg would fail, independent of any "miscalculations" of the insolvency figure.

**4.** Goldberg testified, and the district court found, that the recision was made at Goldberg's direction. Goldberg also testified that shortly after finding out about the shortfall he telephoned bank President Marx Edwards and asked him to "hold up." When asked on cross-examination if this meant "hold off booking the stock purchase," he replied, "I didn't tell him to hold off on booking the stock purchase. I said just hold up and I'm going to check with our lawyer and see where we are." Tr. Trans. p. 63. What exactly Mr. Marx was to "hold up" *on,* if it was not booking the stock purchase, is not clear from Goldberg's response, nor is it clarified anywhere else in the record.

same day the bank was declared insolvent by the OCC and closed.

## II. PROCEEDINGS BELOW

On January 22, 1988, the FDIC, as Receiver for Century National Bank, filed suit against the Goldberg to collect on the $100,000 promissory note. In his responsive pleadings the only defense Goldberg asserted was payment, via credit or offset. He claimed he was due a credit because the bank had never "issued" the stock for which he had tendered $100,000.[5]

At trial it emerged that Goldberg's theory was somewhat different than first pled. Rather than alleging that the stock had never been issued,[6] he was in fact asserting it had been issued but then rescinded by the Board. Even though that rescission was never recorded, he claimed it was proper because the sale had been made in reliance upon representations of the OCC, representations which had proven to be fraudulent or erroneous.[7] The position of the FDIC was that the October 2nd rescission was ineffective because it was a transaction in contemplation of insolvency and therefore barred by 12 U.S.C. § 91.

After a one day bench trial, the lower court ruled, as a matter of law, that the Board's October 2nd rescission was not a transaction in contemplation of insolvency and was therefore effective, entitling Goldberg to a credit to his loan of the resultant proceeds. The FDIC then submitted a motion to re-open the trial, or, in the alternative, for a new trial. In support of its motions, the FDIC claimed that Goldberg's testimony concerning alleged "misrepresentations" by the OCC constituted a "surprise" defense which the FDIC was entitled to an opportunity to counter.[8]

It also argued that the trial court had erred in ruling the rescission was not a transaction in contemplation of insolvency. This motion was denied and the FDIC now

---

5. In Goldberg's Original Answer he asserted that, "Century National bank ... *did not issue the stock to Mr. Goldberg* .... Since Century National or its successors in interest have never refunded the Certificate of Deposit proceeds to Mr. and Mrs. Goldberg, [the CD was held in her name], defendant GOLDBERG is entitled to a credit or offset against the promissory note." (Emphasis added) (Record Excerpts p. 98.)

6. At trial Appellee's counsel did embark on a line of questioning as to whether or not Mr. Goldberg had ever *physically* received the stock certificates. Presumably in order to substantiate Goldberg's initial claim that the stock had not been issued. The trial court also found this fact significant because it listed among its findings of fact that Goldberg had never received the stock. This point is alluded to again, but not argued, in Appellee's Brief. Because the trial court seemed to believe that the issue of receipt was relevant we feel compelled to address it.

Ownership of this stock is established by issuance and recording. Physical receipt is irrelevant. "[A] person becomes a stockholder by subscribing for stock, paying the amount to the company or its proper officer, and being entered on the stock book as a stockholder. He may take out a certificate or not, as he sees fit. Millions of dollars are held without any certificate; or, if certificates are made out, without their ever being delivered." *Scott v. Deweese,* 181 U.S. 202, 216, 21 S.Ct. 585, 590, 45 L.Ed. 822 (1901).

7. It is not clear exactly what his theory is. He didn't plead any theory of fraud, nor the details of his defense, with specificity. His brief contains the words "fraudulent" and "fraud," and he cites us cases on that issue, but he fails to say how they apply in this case where fraud was neither pleaded nor proven. Contrary to the assertion in his brief we do not find that any allegations of fraudulent misrepresentation are mere "background."

8. The FDIC's attorney objected to this new defense at the commencement of the trial but the motion was never ruled on. The exchange was as follows:

Attorney for FDIC: I have learned that the defendant will be relying on [a] defense based on fraud or mistake caused by a representative of the Office of the Comptroller of the Currency.... I learned of this two days ago[.] This is not affirmatively plead [sic] in the defendant's answer and I am not prepared to rebut any allegations of fraud or mistake.
. . . .
The Court: I don't see any such contention in the Pre-trial Order.
. . . .
Attorney for Mr. Goldberg: *We are not basing our case upon fraud.* We are basing our case upon whether or not the bank, or Mr. Goldberg, was entitled to an offset or credit with regard to the CD that was cashed in at a previous time.
. . . .
*We are not pleading fraud against the OCC. ... Fraud is not our cause of action.* Trans. p. 8-10 (emphasis added).

appeals both the judgment and the post-judgment rulings.[9]

## III. DISCUSSION

Goldberg made a risky investment in an attempt to save CNB from the ax of insolvency. It was a bold gesture. Unfortunately, the ax fell anyway and CNB "perished." Now Goldberg would have us "freeze the frame" at the point of his investment so he can insert a new ending, one in which there is no $100,000 investment, no stock, and his money is saved. But this court cannot rescue Goldberg from his investment anymore than he could save CNB. The ax of imminent insolvency stilled the Board's hand and made permanent the stock issued to him. That is the result compelled by 12 U.S.C. § 91.

Twelve U.S.C. section 91, entitled "Transfers by bank and other acts in contemplation of insolvency," states in pertinent part:

*All transfers of the notes,* bonds, bills of exchange, or other evidences of debt *owing to any national banking association,* or of deposits to its credit; ... all deposits of money, bullion, or other valuable thing for its use, *or for the use of any of its shareholders or creditors; and all payments of money to either, made after the commission of an act of insolvency, or in contemplation thereof,* made with a view to prevent the application of its assets in the manner prescribed by this chapter, or with a view to the preference of one creditor to another ... *shall be utterly null and void....*

12 U.S.C.A. § 91 (West 1989) (emphasis added).[10]

"A bank is in contemplation of insolvency when the fact becomes reasonably apparent to its officers that the concern will presently be unable to meet its obligations, and will be obliged to suspend its ordinary operations." *Kullman & Co. v. Woolley,* 83 F.2d 129, 132 (5th Cir.1936). "In other words, if [the officers of the bank] knew, or *ought to have known,* that at the time of the transfers the suspension of the regular business of the bank was imminent, the transfers were made in contemplation of insolvency." *Bender v. Etnier,* 26 F.Supp. 484, 487 (M.D.Penn.1939). (Emphasis added)

The evidence offered at trial makes clear that Goldberg and the members of the Board knew that closure of CNB was imminent. According to the minutes of the September 24th meeting, OCC representative Yeuenger informed the Board that CNB's condition was grave and that it could face liquidity insolvency in "a matter of days." Indeed, as Goldberg admits, the very stock in dispute was issued in an attempt to *forestall* the imminent closure of CNB.[11] The record reflects that Goldberg and bank officers were frequently in contact with OCC representatives. The first attempt to close CNB on September 18, 1986 had been reported on the local news and resulted in a run on the bank. According to testimony at trial, rumors that CNB was about to be closed were "on the street" some days ahead of any action by the OCC. In sum, all parties knew, or

**9.** The first point raised by the FDIC on appeal is that the trial court erred when it held that the rescission by the Board of Directors, hours before the bank was declared insolvent, was not a transaction in contemplation of insolvency in violation of 12 U.S.C. § 91. Since that ruling was one of law it is subject to this court's *de novo* review. Because our ruling on this issue disposes of the case we need not decide the FDIC's other claims.

**10.** The current statute was originally passed, in substantially its present form, as part of the National Bank Act of 1864. (Act June 3, 1864, c. 106, § 52, 13 Stat. 115). It was revised in 1873

(Act Mar. 3, 1873, c. 269, § 2, 17 Stat. 603) and codified at Revised Statutes, Title LXII, Ch. 4 § 5242, later incorporated into the Code.

**11.** By Goldberg's own admission, the purpose of the additional stock purchase, which the Board of Directors sought to reverse on October 2nd, was to *"bring the bank solvent,"* (Emphasis added) (Tr. Trans. p. 53, line 16). If the bank had to be "brought" solvent, it must necessarily have been *in*solvent at the time. Furthermore, when, by September 24th, it was clear that "the plan was not going to work," *Id.* line 20, it must have been similarly clear that the bank would soon be *declared* insolvent.

**1092**

should have known, that closure of the bank was imminent.[12]

Our analysis of the facts, up to this point, does not differ from that of the trial court. In its "Findings of Fact" the court noted, among other things, that CNB was insolvent on September 18, 1986 and that Goldberg was aware of this fact; that Goldberg was told by the OCC that the September 19th capital infusion was "insufficient to keep the bank solvent"; and that Goldberg was aware that "the Bank's insolvency could not be cured fast enough." The trial court's findings of fact, although they focus on Goldberg and not CNB's officers,[13] contain the elements of a transaction in contemplation of insolvency; (1) that the bank was technically insolvent at the time of the rescission, or soon would be and, (2) that Goldberg and the Board knew of this condition when the rescission was attempted. The undisputed facts in this case compel the conclusion that the rescission and credit were transactions in contemplation of insolvency. Therefore, the trial court's legal conclusion to the contrary was in error.

Nevertheless, Goldberg claims that to find the rescission void the FDIC must meet a <u>two</u>-pronged test: (1) That the re-

scission was made when the directors knew or should have known that a declaration of insolvency was imminent, and (2) that it must be made with an intent to prefer.[14] While not disputing any of the evidence with respect to the first prong, Goldberg argues that the FDIC has not met its burden of proof on the second prong because it has failed to offer evidence that the Board's intent, in voting for the rescission, was to prefer Goldberg, Hill and Century Development Corp. to other creditors. He claims that in fact there was no intent to prefer but rather that the Board acted on its own to correct a fraudulent sale of its stock.[15]

Goldberg misperceives the law on this question. The question of intent is one of law, to be reached from the undisputed facts. The FDIC need not offer any evidence of intent to prefer if it is clear that the effect of the transaction is to grant a preference.[ ] Every person is *"presumed to intend the natural and probable consequences of his own acts."* Browne v. Stronach, 7 F.2d 685, 688 (D.Mont.1925) (emphasis added). See Aycock v. Bradbury, 77 F.2d 14, 17 (10th Cir.1935) cert. denied 296 U.S. 589, 56 S.Ct. 101, 80 L.Ed.

---

12. Most telling is Goldberg's testimony on cross-examination.

Q. (Counsel for FDIC) Did you know on October 2nd, that the closing of the bank was imminent?

A. (Goldberg) I didn't know it as a fact but ... when I learned that they were not going to authorize our offering circular, *then obviously it became just a matter of time.* (Emphasis added) (Trans. p. 61).

Goldberg's claim that he lacked *actual* knowledge of the *exact* time the bank was to be closed is not relevant. All that is necessary is that he know closure is imminent—which his testimony indicates that he did. *See First Nat'l Bank of Ortonville v. Andresen,* 57 F.2d 17, 19–20 (8th Cir.1932); *Browne v. Stronach,* 7 F.2d 685, 687–88 (D.Mont.1925).

13. The trial court did not focus on or discuss what the bank's officers knew, although this fact is usually critical because it is *the bank's* knowledge at the time of the transaction which is relevant. In this case however, the evidence clearly demonstrates that the Board was as aware of the precarious financial condition of CNB as Goldberg was. The minutes of the September 24th meeting demonstrate this. Fur-

thermore, even though Goldberg was not a member of the Board or a bank officer he appears to have substantially directed the affairs of the bank with regard to the OCC. He indicates that the OCC called him to inform him of problems. He was arranging for the new capital infusion. He is the one who *asked* the Board to rescind his stock purchase. In *Mechanics Universal Joint Co. v. Culhane,* 299 U.S. 51, 57 S.Ct. 81, 81 L.Ed. 33 (1936), the Supreme Court indicated that the duty not defeat the just and equitable distribution of bank assets called for by the act, "rest[ed] on *all who obtain knowledge by reason of their connection with the bank* ...." *Id.* at 56, 57 S.Ct. at 83 (emphasis added).

14. Section 91 prohibits transactions, "... made with a view to prevent the application of its assets in the manner prescribed by this chapter," (*see* 12 U.S.C. § 194, note 20, *infra*), "or with a view to the preference of one creditor to another ..."

15. We reject Goldberg's argument that the Board may *ipse dixit* find the stock issue invalid because of fraud, rescind the sale, and that its decision is insulated from judicial review in the context of insolvency.

416 (1935); *First Nat'l Bank of Ortonville v. Andresen*, 57 F.2d 17, 19–20 (8th Cir. 1932); *Varden v. City of Corbin*, 2 F.Supp. 840 (E.D.Ky.1933). The intent with respect to transfers in contemplation of insolvency "may be conclusively inferred." *Kullman* at 129. No claim will be heard that the "natural and probable consequences" were not intended by the transferors. *Varden* at 841.[16]

The "natural and probable consequences" of the rescission, if allowed to stand, would be to give Goldberg preferential treatment, as to those fifty shares, over unsecured creditors and other shareholders. If Goldberg is allowed to take $100,000 "off the top" for these shares, then every other unsecured creditor will receive proportionately less for his or her claim because the asset pool will have been reduced by that amount. Goldberg does not dispute this fact. Instead he argues that the preferential *effect* is meaningless as long as the Board's *motive* was pure. This position is not supported by the case law.[17] In the cases cited above, the defendants uniformly tried to argue that there had been no intent to prefer and that argument was rejected. Furthermore, the presumption that transfers which are *in fact* preferential were *intended* to be preferential, when made with knowledge of impending insolvency, is in keeping with the concerns to which the statute was addressed and the policies it reflects.

Section 91 is a part of the National Bank Act. The general purpose of the Act was "to provide for the formation and regulation of national banks." *United States v. Lemaire*, 826 F.2d 387, 389 (5th Cir.1987). An essential part of that purpose was to provide for the orderly winding up of the affairs of insolvent banks in order to bolster public confidence in the banking system. Perhaps the most important member of the "public" to reassure was the depositor.[18] The most effective way to do this, of course, would be to insure that depositors recover 100 percent of their deposits when an institution fails. Short of this ideal, depositors should be confident of receiving the highest possible portion of their deposit after a fair and impartial division of the insolvent's remaining assets. Since bank officers will most often have knowledge of impending insolvency, as well as the means to effect a transfer, allowing those transfers to stand could well mean that the insolvent bank's assets would be dissipated prior to the appointment of an impartial receiver, leaving nothing to be distributed to depositors.

By the time a national bank is insolvent it is often the case that unorthodox practices have led to a tangle of claims. Many creditors come forward with claims of preference. An insolvent bank is, by definition,[19] one that lacks sufficient assets to

---

**16.** The only exception to this rule is for transactions made in the "ordinary" course of business. "[P]ayment of a check in the usual manner at a teller's window without knowledge on the part of customer that the bank is insolvent, cannot be assailed in a suit brought under the provisions of the statute." *Aycock* at 17. The *Aycock* court listed the following transactions as "ordinary": "receiving deposits, paying withdrawals, making loans, and discounting commercial paper." *Id.* at 17. The attempted rescission here falls into none of these categories and so it is not "ordinary." Indeed, one could argue that *any* action which requires a special meeting of the Board of Directors is *de facto* not an "ordinary" one. *See also Browne* at 689, (Transactions actually occurring in due course do not require alteration of the banks records to give them a semblance of regularity).

**17.** We note that the case which Goldberg cites in support of his position, *Bender v. Etnier*, 26 F.Supp. 484, 487 (M.D.Penn.1936) is distinguishable. In *Bender*, the plaintiff failed to prove that the bank's officers contemplated that the bank would be *declared* insolvent. "The defendants had good reason, at the time of the transfers, *to believe that the bank would go on with its business in the usual way*." *Id.* at 487, (emphasis added). In the present case, however, the numerous meetings with OCC representatives informed the Board that a declaration of CNB's insolvency was imminent.

**18.** The subsequent creation, by Congress, of the FDIC and the establishment of a system of depositor insurance on deposits of $100,000 or less is evidence that depositor protection was the cornerstone, if not the foundation, of public confidence.

**19.** CNB's insolvency is not at issue in this case. No one disputes that the bank was technically insolvent for some time prior to it being declared so by the OCC.

pay every claimant in full. Thus, in these situations, "[q]uick and vigorous action" is required of the Comptroller who must act with "an eye cautiously cocked to the financial interest of the government as a creditor of any 'embarrassed' institution and as guarantor of its depositors." *Lemaire* at 390.

To this end, section 91 "was intended as an aid to the enforcement of the principle of equality among creditors[20] of an insolvent bank." *Pacific Nat'l Bank v. Mixter*, 124 U.S. 721, 726, 8 S.Ct. 718, 720, 31 L.Ed. 567 (1888). "The act contemplates ratable distribution of the assets of an insolvent bank among its several creditors and the particular provision in question [12 U.S.C. § 91] is in furtherance of that purpose." *Aycock v. Bradbury*, 77 F.2d 14, 16 (10th Cir.1935). *See, Downriver Comm. Fed. Credit Union v. Penn Square Bank*, 879 F.2d 754 (10th Cir.1989). One of the most important means for ensuring that this ratable distribution takes place is to prevent bank insiders from taking their shares first. Insiders are in a position to create preferences. The statute was intended to "prevent such banks from *creating* preferences in contemplation of their failure." *Mechanics Universal Joint Co. v. Culhane*, 299 U.S. 51, 55, 57 S.Ct. 81, 83, 81 L.Ed. 33 (1936).

Goldberg was an insider.[21] The Supreme Court has indicated that this is a crucial fact which calls for the presumption of an intent to prefer with respect to 12 U.S.C. § 91. "The duty not to so defeat the just and equal distribution of the assets [of the bank] commanded by the act rest upon *all who obtain knowledge by reason of their connection with the bank ...*" *Mechanics Universal Joint Co. v. Culhane*, 299 U.S. 51, 57 S.Ct. 81, 81 L.Ed. 33 (1936) (emphasis added).

In that case, a director of a bank which was teetering on the brink of insolvency walked out of a meeting in which the bank's insolvency was discussed with a bank examiner and wrote a check to transfer money from an account at the insolvent bank to one at another bank. Two days later the drawee bank was declared insolvent. The account on which the check was drawn was in the name of a manufacturing company of which this self-same director was the president. He claimed the transaction was "ordinary" since it went through the usual clearinghouse process and was therefore exempt from the application of the statute. Justice Brandeis, writing for the Court, did not agree.

> "It is true that ordinarily a payment made by a bank to a depositor in the usual course of business is not recoverable, even though the bank was clearly insolvent. (citations omitted). But the payment here in question was not made in the usual course of business; and the company was not a stranger. Its president and manager was a director of the bank; as such acquired in confidence knowledge of its perilous condition; and, in violation of his statutory duty as director, *used that knowledge for the purpose of preferring his company.*"

*Id.* at 57, 57 S.Ct. at 84.

If insiders such as Goldberg were allowed to take advantage of their position to claim and realize a preference before any declaration of insolvency, or before a receiver was appointed, the limited assets of the bank could soon be depleted. Insiders who gain a preference do so at the expense of depositors. This result is unlikely to inspire public confidence in the banking system. Furthermore, if all claims of preference were paid, (even if only after the appointment of a receiver), it would encourage a first come, first served, disposition of assets—a "race of diligence," *Downriver* at 764, (citing *First Nat'l Bank v. Colby*, 88 U.S. (21 Wall.) 609, 614, 22 L.Ed. 687 (1875), rather than the orderly, pro rata

---

**20.** Depositors are considered "creditors" of an insolvent bank. A shareholder is also a "creditor" but 12 U.S.C. § 194 dictates that shareholders' claims are subordinated to all other claims. *See* note 22 *infra*.

**21.** Judging from his apparently considerable power to direct activities of the bank without any official status or authority other than as a shareholder, Mr. Goldberg appears to have been perhaps the most "inside" of the insiders. Furthermore, as the record reflects, he initiated the rescission.

distribution contemplated by the Act.[22] Therefore, the law "sternly forbids preferences," *Casey v. Cavaroc*, 96 U.S. 467, 489, 24 L.Ed. 779 (1878), and is "distinctly unfriendly to the recognition of special interests or preferred claims. Doubts should be resolved against them." *Downriver* at 762 (citations omitted).[23]

"The Act's unfriendliness to special interests requires a claimant seeking a preference from pro rata distribution of assets to bear a heavy burden of proof." *Downriver* at 762 (citations omitted). With all of the foregoing in mind, section 91 seems designed to eliminate any opportunity to prove that a preference is justified in cases such as this one where an insider, with knowledge of impending insolvency, negotiates or institutes a transfer to his own benefit prior to that insolvency. The statute declares these transactions void, as a matter of law, based on a presumption of improper intent.

In sum, the Board's action here seems to be precisely the sort of transaction Congress had in mind when it passed the statute. Because of their position as insiders, Goldberg and the others not only had advance warning of trouble, but they also had *access* to methods of manipulating funds to their own advantage—precisely what the Act is aimed at avoiding. If section 91 does not apply to the facts in this case it is difficult to imagine in what circumstances it would *ever* apply and the statute would be rendered a nullity.[24]

So the saga of CNB is brought to a close, as this time no one could rescue it from impending financial disaster. It is indeed unfortunate that the last minute capital infusion did not enable Goldberg to save the bank and that it too was lost. However it was a risky investment. Goldberg does not claim to be an unsophisticated investor.[25] Once the investment was made he cannot be allowed to cut his losses at the expense of depositors and other creditors by attempting to blame the OCC for the fact that the investment was not a successful one. The September 19th capital infusion gained CNB two more weeks. One cannot help but think that everyone connected with this transaction "... took counsel of their hopes, and not of their judgment, when they contemplated any prolonged postponement [of closure]." *First Nat'l Bank of Ortonville v. Andresen*, 57 F.2d 17, 19 (8th Cir.1932).

## CONCLUSION

We REVERSE, directing a judgment be entered for the Appellant FDIC and RE-

---

**22.** See 12 U.S.C. § 194 which reads in pertinent part:

> From time to time, ... the comptroller shall make a ratable dividend of the money so paid over to him by such receiver on all such claims as may have been proved to his satisfaction or adjudicated in a court of competent jurisdiction ...; *and the remainder of the proceeds, if any, shall be paid over to the shareholders of such association ... in proportion to the stock by them respectively held.* (emphasis added).

If allowed to stand the rescission would place Goldberg in front of, not behind, other unsecured creditors, including depositors, with respect to those shares.

**23.** Even payments arguably not motivated by any improper purpose, but the effects of which were to grant preferences, have been reversed as transactions barred by 12 U.S.C. § 91. In one case, a bank's selective payments to some customers during one of the "banking holidays" of 1933, to cash payroll checks and to allow checks for foodstuffs to clear, were held to be transactions in contemplation of insolvency. "The bank had no better right to prefer a deposi-

tor because he owed for wages or food than to prefer a depositor who was a widow, or an orphan, or a kinsman of the bank's officers.... [W]e think the District Court correctly held the payments invalid. *Kullman & Co. v. Woolley*, 83 F.2d 129, 133 (5th Cir.1936).

**24.** Goldberg nevertheless contends that he is entitled to the equitable remedy of set-off and cites in support of this proposition *Scott v. Armstrong*, 146 U.S. 499, 13 S.Ct. 148, 36 L.Ed. 1059 (1892) and *Goess v. A.D.H. Holding Corp.*, 85 F.2d 72 (2d Cir.1936). However, both of those cases are distinguishable from the case before us and we find his arguments without merit, particularly where he has neither pleaded nor proven any fraud on the part of the OCC.

**25.** The record reflects that Goldberg is an attorney and a businessman who has been involved in a variety of disparate ventures. Furthermore, by virtue of 12 C.F.R. § 16.5(a), entitled "Nonpublic offerings," he must be "experience[d]" in financial and business matters" and "capable of evaluating ... the risks of the prospective investment" in order to purchase this stock.

MAND for further proceedings not inconsistent with this opinion to permit the calculation of damages.[26]

---

**26.** At trial the parties disputed the interest rate and calculations. We direct the lower court to allow both parties to present evidence on the amounts owed for accrued interest and attorneys' fees under the note.