**MCORP and MCorp Financial, Inc., Plaintiffs,**

v.

**Robert Logan CLARKE, Comptroller of the Currency, and the Federal Deposit Insurance Corporation, both in its Corporate Capacity and in its Capacity as Receiver, and the Deposit Insurance Bridge Bank, N.A., Defendants.**

No. CA3–89–0831–F.

United States District Court, N.D. Texas, Dallas Division.

Feb. 1, 1991.

Alan Miller, Weil Gotshal & Manges, New York City, Alan Miller, Weil Gotshal & Manges, Dallas, Tex., John D. Hawke, Jr., Pauline Heller, Howard N. Cayne, Bruce Rigelman, Arnold & Porter, Washington, D.C., Thomas W. Luce, III, Jeffrey C. King, Andrew L. Siegel, R. Doak Bishop, Kim J. Askew, Hughes & Luce, Dallas, Tex., for plaintiffs.

Stuart E. Schiffer, Acting Asst. Atty. Gen., Marvin Collins, U.S. Atty., Linda Groves, Stuart M. Gerson, Asst. U.S. Atty., Theodore Hirt, Karen Stewart (Lead Counsel), U.S. Dept. of Justice, Civil Div., Wash-

ington, D.C., L. Robert Griffin, Carol Connelly, Office of the Comptroller of the Currency, of counsel), for Robert Logan Clarke.

Michael Lowenberg, P.C., John R. Hulme, Akin Gump Strauss Hauer & Feld, Dallas, Tex., Robert J. Rosenberg, Latham & Watkins, New York City, John P. Lynch, Deborah C. Paskin, Latham & Watkins, Chicago, Ill., for Official Creditors' Committee of MCorp, MCorp Financial, Inc., & MCorp Management.

Robert W. Patterson, Nancy J. Anglin, John L. Rogers, III, Peter F. Lovato, III, William J. McKenna, John H. Spellman, Robert F. Reklaitis, Lawrence F. Bates, Steven F. Warnath, Hopkins & Sutter, Dallas, Tex., (Mark I. Rosen, Deputy Gen. Counsel, Thomas A. Schulz, Asst. Gen. Counsel, Robert G. Clark, Sr. Litigation Atty., Joan E. Smiley, Sr. Atty., F.D.I.C., Washington, D.C., of counsel), John Ratnaswamy, Hopkins & Sutter, Chicago, Ill., Lawrence F. Bates, Hopkins Sutter Hamel & Park, Washington, D.C., for FDIC.

### MEMORANDUM OPINION AND ORDER

ROBERT W. PORTER, District Judge.

Before the Court are six motions: (1) the Comptroller of the Currency's Motion to Dismiss or, in the Alternative, for Summary Judgment; (2) the Comptroller's Motion to Dismiss the Complaint in Intervention of the Creditors' Committee of MCorp, MCorp Financial, Inc., and MCorp Management or, in the Alternative, for Summary Judgment as to the Complaint in Intervention; (3) the FDIC Defendants' Motion to Dismiss the Creditors' Committee's Complaint in Intervention; (4) Plaintiffs' Motion for Partial Summary Judgment; (5) the Creditors' Committee's Motion for Partial Summary Judgment; and (6) Plaintiffs' Motion to Dismiss Defendants' Counterclaim or, in the Alternative, for Summary Judgment with Respect to Defendants' Counterclaim. After careful consideration of the plead-

ings and exhibits in this case, the arguments of counsel, and the pertinent authorities, the Court is of the opinion that the entry of summary judgment in favor of Plaintiffs MCorp and MCorp Financial, Inc., is appropriate in this case.

### I. Summary of the Facts

MCorp is a Delaware corporation and Dallas-based bank holding company that, through MCorp Financial, Inc., owned twenty-five national banks (the MBanks), with roughly eighty-five branches among them, doing business throughout Texas. MCorp owned 100 percent of the stock of MCorp Financial. In 1988, several of the MBanks faced financial difficulty. In October of that year, MCorp asked the FDIC to provide open-bank assistance so that the banks might stay afloat.[1]

Instead of providing a rescue to those banks in danger of failing (MBanks Dallas, Houston and Abilene), the FDIC devised a way to bring the entire MBank network under its control. Minutes of directors' meetings of the FDIC board, of which the Comptroller of the Currency is a member, contain statements indicating that FDIC officials thought the MBanks together would prove a more attractive package to prospective buyers than would a handful of banks individually. The subsequent actions of the FDIC and the Comptroller were consistent with these statements, as the agencies planned and carried out a scheme to technically render insolvent as many MBanks as possible.

As a condition for considering open-bank assistance, the FDIC demanded MCorp agree to a so-called "Standstill Agreement." By this pact, MCorp was, for a specific period of time, to maintain the funding of its banks, particularly the troubled MBanks Dallas and Houston, consistent with the levels of funding at the time FDIC assistance was sought. This meant that other MBanks that had been lending federal funds to MBanks Dallas and Hous-

---

1. Gene Bishop, Chairman and Chief Executive Officer of MCorp, stated in an affidavit that he and other members of MCorp management attempted several times in the summer of 1988 to open substantive discussions with the FDIC re-

garding aid to the MBanks. (Affidavit of Gene H. Bishop in Support of Plaintiffs' Motion for Partial Summary Judgment, sworn December 21, 1989, at page 4.)

ton, to shore up those banks' liquidity, were to continue these federal funds transactions.[2] In exchange for this promise from MCorp, the FDIC was to actively seek a buyer for those troubled MBanks, that they might be transferred without closure.

Additional pressure to accept this agreement came from the Board of Governors of the Federal Reserve. In October 1988 the Federal Reserve Board brought charges against MCorp, alleging the holding company engaged in unsafe banking practices. The Board told MCorp, in an Amended Notice of Charges, that it should implement a plan to use all the corporation's available assets to recapitalize the troubled MBanks.

FDIC officials did have contact with several companies interested in buying MBanks, but no accord was reached. In the meantime, MBanks Dallas and Houston suffered additional losses and became insolvent, save for the regular infusions of capital they received in the form of federal funds lent by other MBanks and the borrowing capacity they were allowed at the discount window of the Federal Reserve. Other MBanks also had become insolvent, according to evaluations by the FDIC and the Comptroller.[3] Rather than closing these banks, however, the FDIC chose to wait.

In late March 1989, events spurred the FDIC to action. On March 21, 1989, a group of shareholders brought an involuntary Chapter 7 action against MCorp in federal court in New York. On March 27, MCorp informed the heads of the individual MBanks of this litigation and issued a press release announcing it intended to convert the suit to a voluntary bankruptcy for reorganization under Chapter 11.[4]

Also on March 27, those individual MBanks with federal funds on loan to MBank Dallas began to demand their return. The first bank to press its demand, MBank New Braunfels, was granted in full its request for the release of $46.9 million in overnight federal funds. As more demands poured in throughout the day, employees at the MBank Dallas money desk sought the advice of James Gardner, the president of MBank Dallas. He advised his employees to withhold payment, both that day and on March 28. The affiliated banks sought a total of $502,305,000 in federal funds.

For several months, MBank Dallas had been handling its liquidity problem by ob-

**2.** MCorp Chairman Gene Bishop also said in his affidavit that the FDIC had earlier refused to negotiate a bailout for the MBanks unless MCorp downstreamed all holding company funds into chosen MBanks and/or merged all the MBanks. Sherson Lehman Hutton, one of MCorp's largest creditors and stockholders, told MCorp's Board of Directors that it believed a downstreaming of holding company assets would violate MCorp's fiduciary duties. Another company filed suit against MCorp in Delaware seeking an injunction that would prohibit the holding company from downstreaming assets, charging such a move would amount to a fraudulent conveyance under Texas law. This suit *Charlifco and Charter National Life Insurance Co. v. MCorp*, C.A. No. 10426, filed November 9, 1988, Del.Chancery Court, was stayed pending the outcome of the MCorp litigation before Judge Lynn N. Hughes of the Southern District of Texas.

**3.** Sherwin R. Koopmans, assistant director of the FDIC's Division of Bank Supervision, said in his deposition that the FDIC considered MBank Abilene insolvent as of October 31, 1988. The bank was not declared insolvent until March 28, 1989. Koopmans said several other MBanks, which he did not name, were insolvent based on

a primary capital ratio, as of December 31, 1988. (Deposition of Sherwin R. Koopmans, June 1, 1989, at 210–12.)

In October 1988, R. Clydell McSpadden, Jr., a senior national bank examiner for the Southwestern region of the United States, issued a report on the MBanks for the Comptroller. This report stated that as of September 30, 1988, 20 of the MBanks did not meet either the minimum capital levels as established by statute (12 U.S.C. § 3907) or the lower capital requirement MCorp had negotiated with the Office of the Comptroller of the Currency (OCC).

Also, the OCC, in a document titled "Banking Update," dated February 17, 1989, said that five MBanks, including Dallas and Houston "were already insolvent at 9/30/88, three more were almost surely insolvent by year-end given the magnitude of their losses and nonperforming asset levels, and the remaining thirteen were losing money at annual rates ranging from −0/03% to −1.82% on assets."

**4.** An "MGram," directed to MCorp employees, stated that MCorp officials became aware of the suit "late Friday, March 24." The document also stated that the MCorp press release announcing the suit had been issued "early this morning," March 27, 1989.

taining advances at the discount window of the Federal Reserve Bank of Dallas. Loans from Federal Reserve banks typically are 24–hour borrowings, and the limit the Federal Reserve set on the amount it would loan MBank Dallas changed daily. On March 27, after the release of funds to MBank New Braunfels, Gardner saw that MBank Dallas was approaching its borrowing limit for the day. The FDIC and the Office of the Comptroller of the Currency (OCC) noticed this as well.

The FDIC and the OCC had been monitoring MCorp's finances on a daily basis since at least November 1988.[5] At 6:56 p.m. on March 27, Stephen Sage, an OCC employee stationed at the MBank Dallas money desk to monitor the bank's liquidity, sent an electronic message to his supervisor in Washington, D.C., Mark O'Dell. Sage wrote that several of the MBanks had made unsatisfied demands on MBank Dallas that day and that some of the MBanks, including MBank New Braunfels, were refusing to continue with the regular practice of selling overnight federal funds to MBank Dallas. The next morning, March 28, O'Dell received electronic messages from both Sage and his co-worker, Jeris Hager. These messages stated that the MBanks were continuing to pressure MBank Dallas for the return of their funds. Also on March 28, the directors of MBanks Dallas and Houston, through their counsel, wrote to the FDIC Chairman Wil-

liam Seidman telling him of the liquidity crisis and requesting swift assistance. That same day, March 28, Dean S. Marriott, Senior Deputy Comptroller of the Currency, told the Federal Reserve Bank in writing that the Comptroller believed MBank Dallas "is no longer viable from either a capital or liquidity standpoint." The letter said the FDIC had decided against providing open bank assistance to the troubled MBanks, and that without aid from the FDIC or the Federal Reserve, MBank Dallas would be "liquidity insolvent." On that day, March 28, the Federal Reserve cut off MBank Dallas's line of credit and demanded immediate payment of all outstanding advances: $1.425 billion.

With its bloodline to the Federal Reserve severed, MBank Dallas did not have enough liquidity to pay the demands from its affiliates. None of the demands, including a second demand by MBank New Braunfels for the return of $17.1 million in term federal funds, were satisfied.[6] MBank Dallas also was unable to pay back the loans it had received from the Federal Reserve.

On the evening of March 28, FDIC personnel entered the MBanks and began assessing the solvency of each one. By the next day, twenty of the twenty-five MBanks were declared insolvent.[7] The only ones that survived were four MBanks that traded federal funds among themselves, rather than to MBanks Dallas or

---

**5.** In his deposition, Sherwin Koopmans stated that he personally became involved in the day-to-day monitoring of MCorp around November 1, 1988. In April 1988 the OCC had placed an employee, Jeris Hager, in MBank Dallas to monitor the bank's money desk activity. Hager was joined by another OCC employee, Stephen Sage, in June 1988. The Federal Reserve had placed an employee of its own, Angela Szyndel, at the money desk in mid–1988. Sage and Szyndel, along with James Conroy, the FDIC's examiner for MBank Dallas, also held daily "liquidity committee" meetings with MBank Dallas officials.

**6.** MCorp, in its brief for summary judgment filed December 22, 1989, states that in addition to the claims on MBanks Dallas and Houston, MBank Fort Worth owed federal funds to MBank Wichita Falls on March 28, 1989. Both MBank Fort Worth and MBank Wichita Falls were declared insolvent, and MCorp counts MBank Wichita Falls among its list of "Solvent

MBanks," those it claims would not have been declared insolvent had their loans been reimbursed in full by the FDIC Insurance Fund. MCorp has not made explicit to the Court the proportion of the funds owed to MBank Wichita Falls that were on loan to the Fort Worth bank.

**7.** The 20 banks declared insolvent were: MBank Abilene, N.A.; MBank Alamo (San Antonio), N.A.; MBank Austin, N.A.; MBank Brenham, N.A.; MBank Corsicana, N.A.; MBank Dallas, N.A.; MBank Denton County (Lewisville), N.A.; MBank Fort Worth, N.A.; MBank Greenville, N.A.; MBank Houston, N.A.; MBank Jefferson County (Port Arthur), N.A.; MBank Longview, N.A.; MBank Marshall, N.A.; MBank Mid–Cities (Arlington), N.A.; MBank Odessa, N.A.; MBank Orange, N.A.; MBank Round Rock, N.A.; MBank Sherman, N.A.; MBank Wichita Falls, N.A.; and MBank The Woodlands, N.A.

Houston,[8] and MBank New Braunfels, which had been paid its $46.9 million by MBank Dallas on March 27. The banks declared insolvent were immediately placed in an FDIC-formed institution, the Deposit Insurance Bridge Bank (DIBB). They were subsequently sold to Banc One, an Ohio corporation.

## II. Contentions of the Parties

In this suit, MCorp contends that the FDIC acted unlawfully in closing twelve of the MBanks.[9] MCorp maintains that those twelve banks could have remained solvent had the FDIC reimbursed the banks in full for the federal funds they had on loan to MBanks Dallas and Houston at the time the FDIC declared the Dallas and Houston banks insolvent. The FDIC claims it was merely following established policy, designed to preserve confidence in the federal banking system, in deciding it would pay the MBank creditors only the amount they would have received in a straight liquidation of MBanks Dallas and Houston.[10] Depositors and other creditors, including non-M banks, however, were to be compensated in full. The MBanks did not possess enough funds to completely pay off these creditors, so the FDIC made up the difference with its own insurance fund.

MCorp argues that this decision, to fully satisfy the claims of other creditors, while excluding the MBanks, and thus guaranteeing their insolvency, violates the National Bank Act[11] and its mandate that "[a]ll creditors are to be treated alike."[12]

The FDIC and Comptroller raise many defenses: (1) by invoking the doctrine of sovereign immunity, both claim immunity from a lawsuit brought by MCorp; (2) should prosecution of this suit be found permissible, the FDIC and the Comptroller maintain that MCorp is estopped from asserting it was wronged, under the doctrine of equitable subordination; (3) finally, the FDIC argues that federal banking law permits unequal treatment of creditors under the circumstances of this case. The FDIC contends that the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 ("FIRREA")[13], enacted August 9, 1989, merely clarifies the law in existence in March 1989, when the MBanks at issue were declared insolvent. Therefore, the FDIC argues, FIRREA § 212(i),[14] which allows the FDIC to limit creditors of a failed national bank to the amount they would recover in a straight liquidation, should be applied retroactively to this case.

## III. Jurisdiction

### A. The FDIC and the Comptroller

#### 1. Sovereign immunity

##### a. The Federal Tort Claims Act

■ The doctrine of sovereign immunity states that the government is exempt from defending itself against suit, unless it consents to be sued. *U.S. v. Clarke*, 33 U.S. (8 Pet.) 436, 443, 8 L.Ed. 1001 (1834); *U.S. v. Sherwood*, 312 U.S. 584, 586, 61 S.Ct. 767, 769, 85 L.Ed. 1058 (1941). The FDIC contends that MCorp is barred from proceeding with its suit because it has failed to invoke the procedures requisite under the Federal Tort Claims Act (FTCA).[15] Under these procedures, MCorp would have had to present its claim first to the administra-

---

**8.** These banks are MBank Brownsville, N.A; MBank Corpus Christi, N.A.; MBank El Paso, N.A.; and MBank Waco, N.A..

**9.** MBanks Brenham, Corsicana, Denton County, Jefferson County, Longview, Marshall, Mid–Cities, Odessa, Orange, Sherman, Wichita Falls, and The Woodlands.

**10.** The FDIC valued each MBank's claim against MBank Dallas at 80 percent of par. Claims by MBanks against MBank Houston were valued at 78 percent of par. The evidence does not show any payments to have been made at all, since the FDIC immediately declared each of these creditor banks (with the exception of MBank New Braunfels, which is suing the FDIC by a separate action) to be insolvent.

**11.** Codified in part at 12 U.S.C. §§ 91, 194 and also made applicable to the FDIC by 12 U.S.C. § 1821(d).

**12.** *White v. Knox*, 111 U.S. 784, 786, 4 S.Ct. 686, 686, 28 L.Ed. 603 (1884).

**13.** Pub.L. No. 101–73, 103 Stat. 183 (1989).

**14.** Actually, this section should properly be labeled 212(a); § 212 replaces subsections (c) through (j) of 12 U.S.C. § 1821, with all the replacement material appearing in quotation marks under § 212's only subsection. The paragraphs key to this case, those replacing 12 U.S.C. § 1821(i), appear at 103 Stat. 242–43. For convenience, the Court will use the shorthand of "§ 212(i)."

**15.** 28 U.S.C. § 2671 et seq.

tive body of the federal agency and would not be allowed to maintain a suit until the agency had made a final disposition of the claim. 28 U.S.C. §§ 1346(b), 2671 et seq., 2675. MCorp, however, styles its claim not as a tort but as a suit alleging violation of the National Bank Act, with jurisdiction granted under 28 U.S.C. § 1348.

The Court finds this claim to fit more securely within the wording and intent of the National Bank Act than the FTCA. However, recent decisions involving bank insolvencies have cited the FTCA as an applicable standard. Many of those decisions have, though, found that the FTCA does not bar suit against the FDIC or the Comptroller for alleged wrongs in the regulation of national banks.

For example, in *FDIC v. Irwin*, 916 F.2d 1051 (5th Cir.1990), the Fifth Circuit held that the decision of the Comptroller of the Currency to declare a bank insolvent and order it closed were discretionary functions protected under the FTCA. The *Irwin* court noted, however, that precedent has recognized a cause of action for negligent operation of a bank. *Irwin*, at 1054–55. In one of those precedent-setting cases, *Gaubert v. U.S.*, 885 F.2d 1284 (5th Cir. 1989), *cert. granted*, —— U.S. ——, 110 S.Ct. 3211, 110 L.Ed.2d 659 (1990), the Fifth Circuit held that certain actions taken by federal agencies in assuming control of a federally insured savings and loan were beyond the protection of the FTCA.

The *Gaubert* court pointed to a dichotomy between a federal agency's protected discretionary functions and its operational activities. Policy judgments, such as the decision to undertake a service, are discretionary. *See Berkovitz v. U.S.*, 486 U.S. 531, 108 S.Ct. 1954, 100 L.Ed.2d 531 (1988); *see also Indian Towing Co. v. U.S.*, 350 U.S. 61, 76 S.Ct. 122, 100 L.Ed. 48 (1955). Operational activities, though, are not discretionary and are thus beyond the protection of the FTCA. The Fifth Circuit classified two types of conduct as operational: (1) situations where an official acts pursuant to statute, and therefore has no individual discretion, and (2) non-policy decisions "undertaken outside the strictures of statutory or regulatory mandates, but which are nonetheless operational in nature." *Gau-*

*bert* at 1289. In *Gaubert*, the Fifth Circuit found that such actions of the Federal Home Loan Bank Board and the Federal Home Loan Bank–Dallas as participating in the management decisions of a savings and loan, directing the savings and loan to convert from a state-chartered entity to one solely under federal control, and supervising the filing of litigation on the savings and loan's behalf qualified as non-policy decisions outside the scope of regulatory dictates. *See Union Trust Co. v. Eastern Air Lines, Inc.*, 350 U.S. 907, 76 S.Ct. 192, 100 L.Ed. 796 (1955).

The Court is of the opinion that the FDIC's actions in this case are sufficiently similar in nature to the conduct of the FHLBB and the FHLB–Dallas in the *Gaubert* case to be classified as operational. Also, unlike the situation in *Gaubert*, here the FDIC directly violated a federal statute, the National Bank Act, that controls its activities. *Gaubert* at 1289. Further, the Court finds that the actions of the FDIC and Comptroller do not constitute discretionary policy judgments within the definition contemplated by the Supreme Court in *Indian Towing*. The evidence presented by MCorp, particularly the transcripts of the FDIC's own board meetings, shows the FDIC sought to craft only an internal policy—not to be disclosed to the national banks under its control—of planning and timing declarations of insolvency so as to lasso as many banks of holding companies as possible, in order to create a more attractive package for resale. Accordingly, the Court finds the actions of both the FDIC and the Comptroller of the Currency to be outside the scope of regulatory activity protected by the FTCA.

#### b. *The Administrative Procedures Act*

MCorp maintains it also has jurisdiction to bring this suit under the Administrative Procedures Act ("APA"), 5 U.S.C. §§ 701 et seq. The APA acts as a funnel to determine the propriety of suits against the federal government or its agencies once the threshold question of subject matter jurisdiction has been determined. *See Califano v. Sanders*, 430 U.S. 99, 97 S.Ct. 980, 51 L.Ed.2d 192 (1977). Section 702 of the APA reads, in pertinent part:

"A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof. An action in a court of the United States seeking relief other than money damages and stating a claim that an agency or an officer or employee thereof acted or failed to act in an official capacity or under color of legal authority shall not be dismissed nor relief therein be denied on the ground that it is against the United States or that the United States is an indispensable party...."

Suits may not proceed under the APA, however, where "(1) statutes preclude judicial review; or (2) agency action is committed to agency discretion by law," 5 U.S.C. § 701(a). The FDIC argues that these exceptions apply to this case. It also maintains that MCorp seeks money damages, not equitable relief, and thus should not be allowed to proceed under the APA.

i. Statutes Precluding Judicial Review

■ The FDIC contends that a federal statute, FIRREA § 212(j), exists to preclude judicial review. This section provides the following:

LIMITATION ON COURT ACTION.— Except as provided in this section, no court may take any action, except at the request of the Board of Directors [of the FDIC] by regulation or order, to restrain or affect the exercise of powers or functions of the Corporation as a conservator or a receiver.

FIRREA § 212(j), Pub.L. No. 101–73, 103 Stat. 183 (1989). Although FIRREA was enacted almost five months after the MBanks at issue were declared insolvent, the FDIC contends that it should be applied retroactively, since its effect is merely jurisdictional and not substantive.

In support of its contention, the FDIC cites *Triland Holdings & Co. v. Sunbelt*

*Service Corp.*, 884 F.2d 205 (5th Cir.1989). The Court is of the opinion that the FDIC's reliance on the *Triland* decision is misplaced. While the court in *Triland* did hold that two jurisdictional sections of FIRREA should be applied retroactively, the Court's holding was limited to FIRREA §§ 407 and 209, which are not relevant to the issue before this Court. FIRREA § 407 repeals 12 U.S.C. § 1730(k)(1), which concerned enforcement procedures for insured institutions found to have violated its duties. Section 209 amends 12 U.S.C. § 1819, which states the FDIC's corporate powers, including the "sue and be sued" provision. Section 209 determines which forum, federal court or state court, has jurisdiction over certain suits where the FDIC is a party. The section the FDIC wishes to apply here, § 212(j), acts not to determine jurisdiction so much as to deny it altogether. In this regard, § 212(j), if applied retroactively, is not only procedural but substantive.[16]

In further support of its contention that FIRREA § 212(j) should be applied retroactively, the FDIC cites *Yegen Associates, Inc. v. FSLIC*, No. CA3–89–0684–R, slip op., 1989 WL 225019, Lexis 16097 (N.D. Tex. Sept. 25, 1989), which holds that "[n]ew laws must be applied to pending cases unless that application would be contrary to legislative intent or would result in manifest injustice." Again, the FDIC's reliance is misplaced. *Yegen* is inapplicable to this case, for several reasons. First, *Yegen*, like *Triland*, deals with purely jurisdictional matters, specifically, which court—federal or state—should hear a suit. Second, the *Yegen* court states that it takes its authority for the applicability of new laws to pending cases from two Supreme Court opinions, *United States v. The Schooner Peggy*, 5 U.S. (1 Cranch) 103, 2 L.Ed. 49 (1801), and *Bradley v. School Board of Richmond*, 416 U.S. 696, 94 S.Ct. 2006, 40 L.Ed.2d 476 (1974).

16. The FDIC also seeks support from *FDIC v. Cherry, Bekaert & Holland*, 742 F.Supp. 612 (M.D.Fla.1990). That case retroactively applied FIRREA §§ 212(c)(3)(B), 212(d)(2)(A)(i) and 217(4) to allow FDIC–Corporate to assert the attorney-client privilege on behalf of a bank taken over by the FDIC–Receiver. The issues of jurisdiction and attorney-client privilege are so dissimilar, and the reasoning in *Cherry, Bekaert & Holland* so unclear, that the case carries no weight in this action.

In *The Schooner Peggy*, the Court counseled its judicial brethren to "struggle hard against a construction which will, by a retrospective operation, affect the rights of parties." 1 Cranch at 110. In *Bradley*, the Court interpreted *The Schooner Peggy* case to stand for the proposition that a finding of injustice hinged on "(a) the nature and identity of the parties, (b) the nature of their rights, and (c) the nature of the impact of the change in law upon those rights." *Bradley* 416 U.S. at 717–18, 94 S.Ct. at 2019–20. The Court determined in *Bradley* that a new law should be imposed so as to allow plaintiffs to collect attorneys' fees from a defendant school board that had failed to effectively desegregate public schools. The Court distinguished the special impact of the school desegregation claim at issue from "mere private cases between individuals." *Bradley* at 717, 718, 94 S.Ct. at 2019, 2020 (citing *The Schooner Peggy* 1 Cranch at 110). However, the *Bradley* Court made clear that in cases where "new and unanticipated obligations may be imposed upon a party without notice or an opportunity to be heard," courts should avoid the imposition of laws not in effect at the time the cause of action arose. *Id.* 416 U.S. at 720, 94 S.Ct. at 2020. The Richmond School Board, from the filing of the original complaint against it thirteen years previously, could have been compelled to pay the plaintiffs' attorneys' fees under a common-law theory. To award attorneys' fees under the new statute, therefore, did not confront the defendant with a wholly unanticipated claim.

In the present case, application of the new law, FIRREA § 212(j), would impose upon MCorp a completely unanticipated constraint: the inability to have the portion of its complaint that is against the FDIC as Receiver heard in federal court.[17] The Court finds that such a limitation constitutes "manifest injustice," as stated in *Yegen*. Accordingly, the Court declines to apply FIRREA § 212(j) retroactively in this case.

### ii. Agency Discretion

The FDIC also argues that its actions regarding the MBanks are protected by the APA because such actions are within the scope of the FDIC's discretion as a federal agency. The APA does give broad latitude to federal agencies, including the Comptroller of the Currency and the FDIC, in employing agency discretion to carry out their designated functions. 5 U.S.C. § 701(a)(2). However, this latitude is not without limitation.

In general, the agency discretion exception to judicial review is a narrow one. *Citizens To Preserve Overton Park v. Volpe*, 401 U.S. 402, 410, 91 S.Ct. 814, 820, 28 L.Ed.2d 136 (1971). The discretion exception "may be invoked only upon a clear and convincing showing that to do so would further the intent of Congress." *Ashton v. Pierce*, 541 F.Supp. 635, 643 (D.D.C.1982) (citing *Morris v. Gressette*, 432 U.S. 491, 97 S.Ct. 2411, 53 L.Ed.2d 506 (1977)). When the agency is operating in an area in which no law dictates standards for it to follow, the reviewing court must let the agency's own judgment govern. *Citizens To Preserve Overton Park v. Volpe* 401 U.S. at 410, 91 S.Ct. at 820. An agency may not, however, engage in actions that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).[18]

---

**17.** MCorp here also sues the FDIC in its Corporate capacity, which is not affected by FIRREA § 212(j). The contention that the FDIC has no corporate liability was rejected by Fifth Circuit in *FDIC v. Texarkana National Bank*, 874 F.2d 264, 270 (5th Cir.1989), *cert. denied*, —— U.S. ——, 110 S.Ct. 837, 107 L.Ed.2d 833 (1990); *see also FDIC v. Harrison*, 735 F.2d 408 (11th Cir. 1984). The Comptroller of the Currency is not affected by FIRREA.

**18.** 5 U.S.C. § 706. Scope of review.
To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall—

(2) hold unlawful and set aside agency action, findings, and conclusions found to be—
(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;
(B) contrary to constitutional right, power, privilege, or immunity;

■ In the case of MCorp, the discretion of the FDIC and Comptroller is limited by a standard-setting statute—the National Bank Act. 12 U.S.C. § 91, 194. The act imposes upon these officials the duty to treat creditors fairly and ratably. The Court finds that the actions taken by the FDIC and the Comptroller have violated the duties imposed upon them by the National Bank Act and therefore constitute conduct "not in accordance with the law," within the meaning of 5 U.S.C. § 706(2)(A).

The Comptroller of the Currency urges the Court to look to the rational basis test, which other courts have used to affirm federal agency actions if a rational basis exists to support the agency's decision. *Bowman Transportation, Inc. v. Arkansas–Best Freight System, Inc.*, 419 U.S. 281, 285, 95 S.Ct. 438, 441–42, 42 L.Ed.2d 447 (1974). In such decisions, the Comptroller has been granted wide latitude for decisions regarding insolvency, with reversals granted only where it can be demonstrated that the Comptroller acted arbitrarily and in bad faith. *United States Savings Bank v. Morgenthau*, 85 F.2d 811, 813 (D.C.Cir.), *cert. denied*, 299 U.S. 605, 57 S.Ct. 232, 81 L.Ed. 446 (1936). The Comptroller argues that its decision that the 20 MBanks were insolvent was rational, supported by the data its agents had collected, and that reaching this decision was necessary to fulfilling its duty to safeguard the nation's monetary system.

The decision of insolvency in itself, though, is not the point of this suit. MCorp does not pretend that all the MBanks were financially sound; it blanches at the decision of the FDIC and the Comptroller to delay closing any of the MBanks until a situation was in place that would allow for four-fifths of them to be pulled down at once. The Defendants therefore may not shield themselves from this suit under the claim of agency discretion, as defined by the APA.

### iii. Suits for Money Damages

■ In its argument challenging MCorp's standing to bring this suit, the FDIC also contends that MCorp cannot meet one of the criteria stated in APA § 702, namely, that of presenting a suit that is not for money damages. MCorp characterizes its plea as one for equitable relief in the form of compensation for those MBanks that would have remained solvent had the FDIC agreed to reimburse them in full for their federal funds loaned to MBanks Dallas and Houston.[19]

In the similar case of *Texas American Bancshares, Inc. v. Clarke*, Chief Judge Barefoot Sanders of this Court found that a bank holding company and 10 of its subsidiary banks were entitled to monetary relief when seeking to be paid in full by the FDIC, as were other creditors, rather than given only 67 percent valuation for federal funds loans. 740 F.Supp. 1243, 1248 (N.D. Tex.1990). In reaching this conclusion, Judge Sanders relied on the Supreme Court's analysis in *Bowen v. Massachusetts*, distinguishing between money as damages and money as specific relief awarded in an equitable action: "The term 'money damages,' 5 U.S.C. § 702, we think, normally refers to a sum of money used as compensatory relief. Damages are given to the plaintiff to *substitute* for a suffered loss, whereas specific remedies 'are not substitute remedies at all, but attempt to give the plaintiff the very thing to which he was entitled.'" 487 U.S. 879, 895, 108 S.Ct. 2722, 2732, 101 L.Ed.2d 749 (1988)

(C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;

(D) without observance of procedure required by law;

(E) unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or

(F) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.

. . . .

19. MCorp has yet to present the Court with a definite statement of the amount of damages it seeks. MCorp's amended complaint, filed April 21, 1989, states only that the company requests "in excess of $70 million," the amount it says constituted the positive net worth of those MBanks that were wrongfully closed. The Creditors' Committee, in its complaint in intervention, asks also for the proceeds of the sale of the 12 MBanks the Plaintiffs contend were unlawfully closed and any assets remaining in those banks' receivership estates.

(quoting *Maryland Dep't of Human Resources v. Department of Health & Human Services*, 763 F.2d 1441, 1446 (D.C. Cir.1985) (emphasis in original)); *see Larson v. Domestic & Foreign Commerce Corp.*, 337 U.S. 682, 687–88, 69 S.Ct. 1457, 1460–61, 93 L.Ed. 1628 (1949).

Since MCorp itself claims to seek only equitable relief, the Court finds that the APA's prohibition of an award of money damages should not preclude this suit. When the issue of relief is addressed, the Court shall thus look to render a judgment that complies with this idea of equitable relief.

### c. *Agency consent to suit*

Having found that under either cast, as a tort or as a suit under the National Bank Act subject to the APA, federal jurisdiction exists in this action, the Court also wishes to address the effect of specific statutes regarding sovereign immunity as related to the FDIC and the Comptroller.

### i. The FDIC

■ "The 'sue-and-be-sued' language of 12 U.S.C. § 1819 (Fourth) is a general waiver of sovereign immunity from claims brought against the FDIC." *Woodbridge Plaza v. Bank of Irvine*, 815 F.2d 538 (9th Cir.1987); *see also Keifer & Keifer v. Reconstruction Finance Corp.*, 306 U.S. 381, 390–92 & n. 3, 59 S.Ct. 516, 518–19 & n. 3, 83 L.Ed. 784 (1939); *Federal Housing Administration v. Burr*, 309 U.S. 242, 245, 60 S.Ct. 488, 490, 84 L.Ed. 724 (1940); *see, e.g., Franchise Tax Board v. United States Postal Service*, 467 U.S. 512, 104 S.Ct. 2549, 81 L.Ed.2d 446 (1984). In *Franchise Tax Board*, the Supreme Court broadly characterized the "sue and be sued" authorization, because the federal agency at issue in the case, the Postal Service, was operated like a business and intended to be self-supporting. Judge Sanders' opinion in *Texas American Bancshares, Inc. v. Clarke*, defined the FDIC as a similarly

"quasi-private" governmental entity. "[T]he FDIC has the same broad 'sue and be sued' language in its governing statute, and it relies on premiums from insured banks and the income therefrom. Thus, the FDIC is not entitled to claim sovereign immunity." *Texas American Bancshares, Inc. v. Clarke* at 1249.

### ii. The Comptroller of the Currency

■ The Comptroller likewise claims that he may not be sued for acts taken in his official capacity. It has been held, however, that the Comptroller is obligated to treat banks and creditors fairly when making decisions, including declarations of insolvency.[20] "This duty is not a duty to discover improper conduct within the Bank ... but rather the duty not to act arbitrarily in declaring a solvent bank to be insolvent in violation of applicable banking laws." *Golden Pacific Bancorp v. Clarke*, slip op. Civil No. 85–2384, 1986 WL 13881 (D.D.C. August 21, 1986), *aff'd*, 837 F.2d 509 (D.C.Cir.), *cert. denied*, 488 U.S. 890, 109 S.Ct. 223, 102 L.Ed.2d 213 (1988); *see Manges v. Camp*, 474 F.2d 97, 100–01 (5th Cir.1973).

### B. *The Deposit Insurance Bridge Bank*

■ The Deposit Insurance Bridge Bank, created to take over the MBanks declared insolvent, no longer exists. It expired for all intents and purposes when the MBanks were sold to Banc One. Therefore, any suit to recover claims from this defunct institution is moot.

### C. *The Creditors' Committee's Standing*

The FDIC and the Comptroller both move to dismiss the complaint in intervention of the Official Creditors' Committee of MCorp, MCorp Financial, Inc., and MCorp Management. The Comptroller also moves, in the alternative, for summary judgment against the Creditors' Committee.[21] The Defendants' motions to dismiss the Creditors' Committee are DENIED.

---

**20.** "Amongst the Comptroller's duties is the obligation to assure the continued viability of national banks where possible, and the orderly and fair liquidation of any national bank which falls into insolvency. The Comptroller is to protect the interests of the United States, direct and indirect, general and specific, and is to secure an equitable distribution of bank assets to the creditors of a failed bank." *U.S. v. Lemaire*, 826 F.2d 387, 390 (5th Cir.1987).

**21.** The six causes of action stated in the Creditors' Committee complaint are essentially sim-

After examining the issues presented, the Court concludes that the FDIC's arguments that this suit is not properly before this Court and/or cannot proceed because MCorp is unable to meet statutory requirements lack merit. Having established that subject matter jurisdiction over this suit exists, the Court next considers the FDIC's substantive claims.

## IV. Analysis

### A. *Standard for Summary Judgment*

Summary judgment is proper where the Court finds "no genuine issue as to any material fact." Fed.R.Civ.P. 56(c). The entry of summary judgment is appropriate "where the underlying facts are undisputed, and the record reveals no evidence from which reasonable persons might draw conflicting inferences about [the] facts...." *Hall v. Diamond M Company*, 732 F.2d 1246, 1248 (5th Cir.1984) (citing *Ardoin v. J. Ray McDermott & Co.*, 641 F.2d 277, 280 (5th Cir.1981)). To state the principle more explicitly, "the court must indulge every *reasonable* inference from [the] facts in favor of the party opposing the motion." *AT & T Co. v. Delta Communications Corp.*, 590 F.2d 100, 101–02 (5th Cir.) *cert. denied*, 444 U.S. 926, 100 S.Ct. 265, 62 L.Ed.2d 182 (1979) (emphasis in original). "[T]he facts and inferences [must] point so strongly and overwhelmingly in favor of one party, that the Court believes that reasonable men could not arrive at a contrary verdict...." *Boeing Co. v. Shipman*, 411 F.2d 365, 374 (5th Cir.1969) (en banc). The moving party does not need to present evidence demonstrating the absence of a genuine issue of material fact; the movant may discharge his burden by showing the absence of evidence to support the nonmoving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–5, 106 S.Ct. 2548, 2552–54, 91 L.Ed.2d 265 (1986).

The party defending against summary judgment, however, must present some evidence contrary to the movant's assertions in order to prevail. "Rule 56(e) itself provides that a party opposing a properly supported motion for summary judgment may not rest upon mere allegation or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial.... [T]o survive [a motion for summary judgment, the opposing party] need only present evidence from which a jury might return a verdict in his favor. If he does so, there is a genuine issue of fact that requires a trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256–7, 106 S.Ct. 2505, 2514–15, 91 L.Ed.2d 202 (1986); *see First National Bank of Arizona v. Cities Service Co.*, 391 U.S. 253, 288–89, 88 S.Ct. 1575, 1592–93, 20 L.Ed.2d 569 (1968).[22]

The Court has made an independent examination of each motion and cross-motion for summary judgment in this case, giving weight to all reasonable inferences that may be drawn in favor of the movant on each particular motion, in accord with the applicable standard discussed above. Indulging every reasonable inference in favor of the Defendants FDIC and the Comptroller of the Currency in their status as non-movants on three of the six motions at issue, the Court is of the opinion that these defendants have failed to set forth specific facts showing the existence of a genuine issue of fact that would warrant a trial.

The Defendants state that MCorp and the MBanks constituted a unitary banking system, and that MCorp management had such control over the individual MBanks as to make interbank funding arrangements unlawful. Therefore, the Defendants argue, paying MBank creditors at a lower rate than all others, even if this results in the insolvency of most of those MBanks, is only fair punishment for what it perceives as MCorp's misbehavior. It is as if the Defendants saw the MCorp holding company as a diseased tree trunk, and then devised a cure of sawing off the tree's branches and grafting them to a new host.

---

ilar to the eight points alleged in the Plaintiffs' First Amended Complaint The Defendants therefore have chosen not to respond with additional briefings.

**22.** The nonmovant also may prevent entry of summary judgment by showing the court good reason why he cannot produce evidence in opposition to the motion. *Bordelon v. Block*, 810 F.2d 468 (5th Cir.1986).

The Defendants have failed, however, to supply the Court with facts supporting their hypothesis. As will be further discussed herein, the Defendants have not drawn a nexus between the evidence presented regarding MCorp's structure and operating procedure and any violation of the basic operating rules for bank holding companies that were in place prior to the declaration of insolvency. 12 U.S.C. § 1841, et seq.; *see* Heller, Federal Bank Holding Company Law (1976, 1990).

Further, support for the Defendants' allegations of conspiracy among MCorp and the MBanks to seek preferential treatment for MBank creditors over other creditors is flimsy at best. The facts to which the Defendants point to establish this conspiracy [23] do not rise beyond the level of happenstance. Considering the experience and sophistication of the Defendants' attorneys in this case, the sparseness of this potentially damaging evidence and counsel's failure to set forth a coherent argument detailing the conspiracy scenario, is puzzling. Inferences can be drawn, to be sure, that would cast a taint upon MCorp's actions. The Court finds, however, that the package of inference upon inference that the Defendants need to support their allegations is weak and tenuous at best.

While the Defendants' allegations are insufficiently supported by the evidence, the Court is of the opinion that MCorp's allegation that the FDIC and the Comptroller plotted to close as many MBanks as possible is substantiated by the evidence as follows.

In a meeting of the FDIC Board of Directors on October 25, 1988, board member William Roelle handed out reports on both MCorp and another bank holding company, Texas American Bancshares. He then projected how, if the federal funds loaned among the MBanks were valued at 70 percent of their actual amount, the result would be the failure of many of the MBanks, which the FDIC could then "grab." [24]

In another meeting of the FDIC Board of Directors, in early November 1988, board member Paul Fritts, the FDIC Director of Bank Supervision, painted a picture of how the board might resolve the MBanks' situation:

> "[I]f in fact they had a liquidity squeeze and—and—our 30 percent loss on intercompany funding is, in fact, somewhere where the loss would be, we would capture 16 of the banks as of October 31 and control 75 percent of the total assets. If, in fact, we went back to the scenario where we relook— or, in fact, look for the first time individually at two individual banks, MBanks Fort Worth and MBank Austin—those banks are such that, and I understand we did not go into those banks, and *if we analyzed and found them to be insolvent where you could reach those as*

---

**23.** These facts include 1) proposals advanced by MCorp that were adopted by the boards of directors of many of the MBanks, 2) the position of several officers and directors of MCorp as directors of an individual MBank prior to November 1988, and 3) the fact that conversations took place between an MCorp officer and the head of MBank Dallas, and between this officer and the head of MBank New Braunfels, on the morning of March 27, 1989. That was the day MBank Dallas authorized the release of certain federal funds to the New Braunfels bank, while denying requests from other MBanks (and another request from New Braunfels) that came later in the day.

**24.** A transcript of the board meeting quotes Rolle:

> "We have a letter that the Chairman received yesterday from MCorp announcing their—their third quarter results and the suspension of interest payments. We also have

the first set of reports that we will be issuing daily on TAB/NBC and MCorp relative to their capital position and the Fed funds sold position of the subsidiary banks and approximately what condition the system would be in if the lead bank were to fail....

> "The key—the key column to look at on the MBank numbers would be key cap assuming a 70 percent valuation of the Fed fund sold. And what that really says is if we issued receivership certificates valued at 30 percent, that those are the banks after the lead bank of Dallas. All the banks with parens [parentheses] around them would be the banks that would be rendered insolvent.... You would see we would grab a great number in—in terms of—of failures. We would end up with a great number of the subsidiary banks in both TAB and MBank."

(FDIC board minutes of October 25, 1988, at 021285)

*well, you get 18 of the 25 banks, and you get 82 percent plus of the total assets. And the remaining seven banks are not really significant in the big picture.*
. . . [25]

*"Makes it a pretty—pretty good package, and all you really need to do to get that much—and I hate to say it this way but—is to—to have a liquidity insolvency at Dallas and Houston, and I don't think that's a very far-fetched thing, as long as the other banks aren't allowed to pull their money out."*

(FDIC board meeting of November 2, 1988, reconvened at November 3, at 022234–5) (emphasis added).

Fritts then suggested a possible way of making sure those MBanks would not withdraw their funds from the Dallas and Houston MBanks:

"[I]f you stepped right in and said, you know, 'The Fed's not going to fund you anymore. You're up to "X" dollars.' Those two banks close." [26]

25. Fritts continued:
"They're going to get some value, but several of those are probably going to fail down the line. It seems to me that, at least on those two banks, the avenue of going back and trying to see whether—I mean, Fort Worth has $180 million in classified paper and $36 million in capital. Austin has $167 million in classified assets and $30 million in capital. Well, that captures another billion seven in total assets.

26. *Id.* at 022236.

27. A portion of the dialogue went as follows:
Chairman Seidman: —you could have all the banks and the holding company be in saying we're going to stand still.
Mr. Stone: Because if they call it and the—and the lead bank refuses it, I think that's the—I don't know, but I tell you, if you don't pay the Fed funds line to an affiliate that demanded it, don't you have a legal problem?
Mr. Cook: You have insolvency.
Chairman Seidman: Yes. We ... all right, that's then is one—that covers what we would do in that alternative.
(*Id.* at 022271)

28. The minutes of these FDIC board meetings indicate that board members had doubts about the fairness of the Standstill Agreement and whether MCorp officials would interpret the FDIC's mandate of an interbank funding scheme as a predatory move by the FDIC. In the summer of 1988, a similar arrangement

Other board members, including Chairman Seidman, joined in visualizing how such a scenario could be brought about, and indicated that they were amenable to this method of achieving the MBanks' insolvency. [27]

In this November 1988 meeting, the FDIC board decided to demand MCorp enter into the "Standstill Agreement" as a condition for the FDIC to consider providing open-bank assistance to the troubled MBanks. This Standstill Agreement mandated that MCorp would keep in place the lines of funding it had established to maintain liquidity at MBanks Dallas and Houston. This ensured that smaller MBanks would continue to loan millions of dollars in federal funds to the Dallas and Houston banks. [28]

If the smaller MBanks faced liquidity shortages of their own, however, the FDIC board planned to take advantage of the squeeze. At the November 2, 1988, meeting, board members stated that they had obtained the agreement of the Federal Re-

between the FDIC and the Dallas bank of First RepublicBank Corporation had ended in the closure of the Dallas bank and all 40 of First RepublicBank's Texas subsidiaries. The FDIC also "manufactured" the insolvency of First RepublicBank Delaware, Judge Fitzwater stated in a preliminary ruling of this district. *Senior Unsecured Creditors' Committee of First RepublicBank Corp. v. FDIC,* 749 F.Supp. 758 (N.D.Tex. 1990).

At the November 2, 1988, meeting (reconvened November 3), one board member wondered if proposing the Standstill Agreement would "be a red flag to MCorp ... [b]ecause they know how it was used in the First Republic situation." The board spend a good portion of that meeting discussing the precise phrasing of the letter outlining the agreement to MCorp. The members paid careful attention to their choice of words:
Chairman Seidman: Okay, then why does the next sentence say, 'We believe that it is in our interest to explore open bank assistance.' Because we're exploring all kinds of assistance: open and closed. That sounds to me to be kind of affirmatively misleading.

.  .  .  .  .

Mr. Delston: That was just a little sugar coating. I—it's not essential.
Chairman Seidman: Well, I—I'm—you know, we're not going to fool these people in my opinion....
(at 022299, 022302)

serve Bank of Dallas to prevent MBank Dallas from borrowing from it to repay the federal funds it had borrowed from the other MBanks. In this manner the FDIC board, which included the Comptroller of the Currency, with the cooperation of the Federal Reserve, enacted its plan to realize the scenario the board members spun out at the October and November 1988 meetings.

## B. *Equitable Subordination*

In the FDIC's first substantive contention, it sets forth the theory of equitable subordination. Under this theory, the FDIC argues, MCorp should be considered inferior to other creditors of MBanks Dallas and Houston, because the corporation's activities placed these other creditors at a disadvantage.

To the Court's knowledge, the theory of equitable subordination has been confined to bankruptcy matters. In fact, the test enunciated by the Fifth Circuit for whether equitable subordination is justified is: "(1) the claimant must have engaged in some type of inequitable conduct, (2) the misconduct must have resulted in injury to the creditors of the bankrupt or conferred an unfair advantage on the claimant, and (3) equitable subordination of the claim must not be inconsistent with the provisions of the Bankruptcy Code." *In the Matter of Clark Pipe & Supply Co., Inc.*, 870 F.2d 1022, 1027 (5th Cir.1989), *op. withdrawn, substituted op.* 893 F.2d 693 (5th Cir.1990), (citing *Matter of Missionary Baptist Foundation of America*, 712 F.2d 206, 212 (5th Cir.1983)). Further, the Fifth Circuit has considered equitable subordination an "extraordinary remedy," and has drawn its boundaries narrowly. *In the Matter of CTS Truss, Inc.*, 868 F.2d 146, 148 (5th

Cir.1989). Equitable subordination, the Fifth Circuit concluded, has been effected only in three types of cases: "those in which a fiduciary of the debtor misuses his position to the disadvantage of other creditors; those in which a third party, in effect, controls the debtor to the disadvantage of others; and those in which a third-party defrauds other creditors." *CTS Truss* at 148–49.[29]

■ The FDIC alleges that the MCorp situation falls within one of these three categories. It charges that MCorp used its influence as owner of the MBanks to force the banks into a funding arrangement designed to advantage the holding company while thwarting the best interests of depositors. Then, the FDIC contends, when the insolvency of MBanks Dallas and Houston became unavoidable, MCorp coerced those banks into granting preferential treatment of one bank while denying the requests of others. This is the issue at the heart of *MBank New Braunfels v. FDIC* (No. CA3-89–1064–F), also pending in this Court. The FDIC, however, as will be more fully explained in the *New Braunfels* case, cannot provide either motive or evidence to support its allegations of a preference. The evidence does not show that any other creditor's request was ignored so that MBank New Braunfels' request of federal funds from MBank Dallas might be granted.[30]

Also, no evidence is presented that suggests MCorp abused its fiduciary duty and mismanaged the MBanks in a way that defrauded outside creditors. *See Pepper v. Litton*, 308 U.S. 295, 60 S.Ct. 238, 84 L.Ed. 281 (1939); *In re Sterling House, Inc.*, 356 F.Supp. 1113 (W.D.Va.1973). The FDIC

---

**29.** The Second Circuit has construed the aims of the Bankruptcy Code and the National Bank Act to be so different that the equitable rules of one of these areas of the law should not be applied in the other. This circuit has characterized the distribution requirements of the Bankruptcy Act to be fairness and equitability, while reminding litigants that the rule of the National Bank Act calls for ratable distribution, which places all creditors on the same footing, regardless of whether that is indeed "fair" under bankruptcy standards. *In the Matter of Stirling Homex Corp.*, 579 F.2d 206, 211 n. 8 (2nd Cir.1978), *cert.*

*denied, Jezarian v. Raichle*, 439 U.S. 1074, 99 S.Ct. 847, 59 L.Ed.2d 40 (1979); *Corbin v. Federal Reserve Bank of New York*, 629 F.2d 233, 236 (2nd Cir.1980), *cert. denied*, 450 U.S. 970, 101 S.Ct. 1492, 67 L.Ed.2d 621 (1981).

**30.** In order to find a preference occurred, the Court must look to the intent of the payer of the funds, MBank Dallas. The intent of the payee, MBank New Braunfels, is significant only in any bearing it might have on the type of relationship that existed between the MCorp holding company and its individual banks.

charges MCorp deliberately maintained MBanks Dallas and Houston so that they were undercapitalized, and wrongfully refused to inject holding company funds into these banks to make them solid institutions. MCorp has demonstrated, however, that as far as the use of holding company funds to save the MBanks, its hands were tied. Stockholders had sued MCorp specifically to prevent it from using its holding company monies to bail out the MBanks. The logical recourse was for MCorp to turn to the FDIC for aid, which it did. Furthermore, the Fifth Circuit has held, in *MCorp Financial, Inc. v. Board of Governors*, that MCorp acted properly in refusing to transfer its corporate assets to the subsidiary banks. 900 F.2d 852, 863 (1990).

After carefully examining the evidence presented, the Court finds the FDIC's claims that MCorp or the MBanks unfairly traded upon their relationships with MBanks Dallas and Houston, or that they defrauded other creditors, to be unsupported by the evidence. It is not appropriate, therefore, to stretch the principles of equitable subordination to apply them to this case.

## C. *Payments to Creditors*

█ In its next substantive argument, the FDIC claims that when a national bank fails, it has the right to reimburse some creditors at a rate more favorable than its grants to others. The FDIC contends this was always the law, and that FIRREA § 212(i), stating that the maximum liability the FDIC shall have to any creditor of a failed institution is the amount that credi-tor would have received in a straight liquidation of the institution, is merely a clarification of the standard operating procedure.[31]

To support this point, the FDIC quotes various statements appearing in the Congressional Record by members of the committees that hammered out FIRREA. The report issued by the Joint House/Senate Conference Committee responsible for FIRREA, the FIRREA Conference Report, stated that "[c]urrent law is clarified" regarding the amount that must be paid to creditors of a failed national bank.[32] Also, U.S.Rep. Henry B. Gonzalez of Texas, the chairman of the joint committee and the House Committee on Banking, Finance and Urban Affairs, later said on the House floor that the Conference Committee had regarded the bill as only a clarification, and that therefore the conferees saw no need to add language of retroactively in order to have § 212(i) apply to receiverships that had occurred prior to its passage.[33]

While statements by legislators are important to courts insofar as they evidence the intent of those drafting laws and voting them into effect, they cannot counteract one hundred years of legal precedent. *See Seatrain Shipbuilding Corp. v. Shell Oil Co.*, 444 U.S. 572, 596, 100 S.Ct. 800, 813–14, 63 L.Ed.2d 36 (1980). The National Bank Act,[34] in force since 1864, states as follows regarding payments to creditors of an insolvent national bank:

§ 194. Dividends on adjusted claims; distribution of assets. From time to time, after full provision has been first made for refunding to the United States

---

**31.** "(i) Valuation of Claims in Default.—

. . . . .

(2) Maximum Liability.—The maximum liability of the Corporation, acting as receiver or in any other capacity, to any person having a claim against the receiver or the insured depository institution for which such receiver is appointed shall equal the amount such claimant would have received if the Corporation had liquidated the assets and liabilities of such institution without exercising the Corporation's authority under subsection (n) of this section or section 13."

Pub.L. No. 101–73, 103 Stat. 183 (1989).

**32.** 135 Cong.Rec. H5279 (daily ed. August 4, 1989).

**33.** 135 Cong.Rec. H7358 (daily ed. Oct. 23, 1989). MCorp urges the Court to also take note of the remarks of Representative Ortiz, who said on the House floor that FIRREA would give new powers to the FDIC and that the bill did not bear the intent that these powers should be available for use with receiverships effected before the bill's passage. 135 Cong.Rec. H5003 (daily ed. August 1, 1989). Rep. Ortiz was not a member of the major committees that considered FIRREA. *See FDIC v. Cherry, Bekaert & Holland,* 742 F.Supp. 612 (M.D.Fla.1990). The Court has not been informed of any record of public debate on FIRREA's retroactivity.

**34.** 12 U.S.C. § 21 et seq., Act June 3, 1864, c. 106, § 52, 13 Stat. 115.

any deficiency in redeeming the notes of such association, the comptroller shall make a ratable dividend of the money so paid over to him by such receiver on all such claims as may have been proved to his satisfaction or adjudicated in a court of competent jurisdiction, and, as the proceeds of the assets of such association are paid over to him, shall make further dividends on all claims previously proved or adjudicated; and the remainder of the proceeds, if any, shall be paid over to the shareholders of such association, or their legal representatives, in proportion to the stock by them respectively held.

This statute has been plainly construed to demand equal treatment for all creditors of a failed institution. "All creditors are to be treated alike." *White v. Knox,* 111 U.S. 784, 786, 4 S.Ct. 686, 686, 28 L.Ed. 603 (1884); *see First Empire Bank v. FDIC,* 572 F.2d 1361 (9th Cir.), *cert. denied,* 439 U.S. 919, 99 S.Ct. 293, 58 L.Ed.2d 265 (1978); *Woodbridge Plaza v. Bank of Irvine,* 815 F.2d 538 (9th Cir.1987); *Texas American Bancshares; Senior Unsecured Creditors' Committee of First Republic-Bank Corp. v. FDIC,* 749 F.Supp. 758 (N.D.Tex.1990). *See also United States v. Lemaire,* 826 F.2d 387, 390 (5th Cir.1987), *cert. denied,* 485 U.S. 960, 108 S.Ct. 1223, 99 L.Ed.2d 423 (1988) (5th Circuit recognized that the Comptroller of the Currency is duty-bound "to secure an equitable distribution of bank assets to the creditors of a failed bank").

Further, as Judge Sanders wrote in his opinion in *Texas American Bancshares, Inc. v. Clarke,* this part of FIRREA was made effective not through addition to the existing law but through repeal of 12 U.S.C. § 1821(d) and its replacement with the new 12 U.S.C. § 1821(i). *Texas American Bancshares, Inc. v. Clarke* at 1252. This method of passage indicates that those who drafted and implemented FIRREA recognized that it was a departure from, rather than a clarification of, the existing law.

The FDIC argues to the contrary, pointing to two rulings where district courts discussed § 212(i) in conjunction with receiverships effected before FIRREA became law. Neither of these cases, however, relies on § 212(i). The first of these rulings, *FDIC and Sunbelt Savings, FSB v. Browning,* 757 F.Supp. 772 (N.D.Tex. 1989), contains a passage where Judge Sanders mentioned that FIRREA places a cap on liability, equal to the amount the claimant would have received in a liquidation. *Sunbelt Savings* at 773. The opinion did not say, however, that this section of FIRREA would, or should, be applied to the creditor-defendant. Instead, the court decided that the claim, against a defunct savings and loan that lacked enough assets to pay off unsecured judgment creditors, was moot. The other case cited, *Castleglen, Inc. v. Commonwealth Savings Ass'n,* 728 F.Supp. 656 (D.Utah 1989),[35] likewise deals with unsecured creditors of a failed thrift. Once again, the principles of § 212(i) are referred to only in passing, in a footnote, and the section itself is not even named. *Castleglen* at n. 19.

The FDIC also directs the Court's attention to two cases decided in 1990 in which it contends § 212(i) was applied to claims made on receiverships instituted before the passage of FIRREA: *Village South Joint Venture v. FDIC,* 733 F.Supp. 50 (N.D.Tex. 1990) and *Triland Investment Group v. FDIC,* 735 F.Supp. 698 (N.D.Tex.1990). In *Village South,* the plaintiff alleged breach of contract, fraud and deceptive trade practices against a savings and loan for its refusal to fund a loan. The savings and loan was then taken over by the Federal Savings and Loan Insurance Corporation (FSLIC), and subsequently, the FDIC. In *Triland,* the plaintiff claimed violations of state usury law, as well as breach of contract. Again, the institution originally sued was a savings and loan. Neither of those cases addresses the type of problem before this Court, of some creditors who were owed money by a defunct national bank being reimbursed at a lower rate than other creditors.

The FDIC, confronted with a crisis of epic proportion in the savings and loan

---

**35.** Coincidentally, both *Castleglen* and *FDIC and*    *Sunbelt Savings, FSB* were issued the same day.

industry, wishes to be frugal in spending its insurance fund to rescue creditors. To that end, the FDIC pushed the principle of liquidation-only value payments that is contained in § 212(i).[36] The FDIC may not, however, shield itself in pre–FIRREA bank failures by declaring the principles of § 212(i) to be retroactive. Fundamental fairness demands that banks and their creditors be able to know what laws will be applied to them at the time insolvency is declared, so they can best plan for the future, rather than being surprised months later.

■ In this situation, the FDIC defends its plan to pay the MBanks that lent federal funds to MBank Dallas proportionately less than other creditors because all the banks were owned by MCorp Financial, and, ultimately, by MCorp. MCorp's operating practices, the FDIC claims, show it to be not just an affiliation of banks but a unitary banking system. Here, the FDIC steers the Court to examine three things: (1) the payment to MBank New Braunfels, (2) the federal funding arrangement between the MBanks, and (3) the general operating structure of MCorp and the MBanks.

The FDIC labels the payment to MBank New Braunfels (MBNB) on March 27 an illegal preference, and therefore a signifi-cant piece of evidence suggesting MCorp was a unitary system. The National Bank Act, at 12 U.S.C. § 91, states that transactions made in contemplation of insolvency, "made with a view to prevent the application of its assets in the manner prescribed by this chapter, or with a view to the preference of one creditor to another ... shall be utterly null and void." The Fifth Circuit, in *FDIC v. Goldberg*, 906 F.2d 1087 (5th Cir.1990), has stated that a manifest intent by the bank to prefer one creditor over others need not be shown. Where the recipient is an insider, such as bank director Goldberg, who used his position to unfairly enhance his finances, a preference will be found. *Goldberg* at 1094; *see Mechanics Universal Joint Co. v. Culhane*, 299 U.S. 51, 57, 57 S.Ct. 81, 84, 81 L.Ed. 33 (1936).

■ In the case at bar, it would be reasonable for anyone with knowledge of the suit filed against MCorp in New York, including the officers and personnel of MBank Dallas, to contemplate that MBank Dallas might soon be declared insolvent. Yet the New Braunfels situation does not demonstrate an intent to create a preference. The Defendants have not shown that at the time MBNB was granted its funds, MBank Dallas was denying non-MBank de-

---

**36.** In 1986 and 1988, U.S. senators introduced bills (S. 2592 and S. 2715, respectively) proposed by the FDIC that would have created preference payments for depositors only when national banks fail. Congress did not pass either bill.

The FDIC states, In "Deposit Insurance for the Nineties: Meeting the Challenge," a staff study issued January 4, 1989, that in a Purchase and Assumption transaction,

"all depositors, uninsured as well as insured, receive full payment on their claims since their claims are 'assumed' by the acquiring institution. In the absence of a depositor preference statute general creditors also normally receive full payment on their claims." The study goes on to say that where a holding company is involved, however, the FDIC considers itself justified in withholding full payment to nondeposit creditors, even as it covers the entire loss for uninsured depositors. "The legal basis supporting this approach has not been codified," the study admits, "but arises from established common law." No citations are given.

The evidence presented in this case indicates the FDIC was fully aware it was operating ac-cording to an untested—and shaky—legal theory. This is borne out by Seidman's statements to other members of the FDIC board on March 28, 1989, regarding the impending closure of the MBanks:

"If I were a judge, that's the way I'd decide it. That might not be what the law is but I would decide it because it seems to me that the insiders should not have any special ability to—I mean, should be treated differently, let me put it that way—that they should be treated differently. They have run these banks as though they were one bank and I think we ought to treat them as though they were one bank and on that basis I am comfortable in moving in that direction. Legally, of course, I don't know how we're going to come out but it doesn't seem to me that we're going to come out much worse if they did hold against us. We'd have some damages probably, but I just think it is the right and proper way to run the banking system to treat these multibank holding companies as though they were one bank for this purpose to the extent that we legally can."
(at 022144)

positors and creditors their opportunity to withdraw funds. Also, as stated earlier, no fact pattern has been developed that would indicate MBank Dallas released funds to MBNB under order from MCorp. Finally, the Defendants have failed to show that MBNB was an insider. While MBNB was an MBank, the evidence does not indicate any special ties to MBank Dallas that would cause the Dallas bank to choose to grant MBNB's funding request over ones from any other MBank. On the evidence presented, the payment to MBNB was an ordinary transaction, and not a preference.

The second point upon which the FDIC bases its theory of a unitary banking system is the federal funds loan arrangements among many of the MBanks. The FDIC argues that this structuring came at the instigation of MCorp and points to the testimony of one MBank president that he had not compared the rates of return offered by other banks on federal fund loans before choosing to invest his MBank's funds solely in MBank Dallas. Other evidence, though, provides an explanation for the funding arrangement. With their common name, it was natural and perhaps prudent that the MBanks aid each other. Minutes from board meetings of some of the smaller MBanks show that their directors were concerned about lending federal funds to MBanks Dallas and Houston. Yet the directors of these smaller MBanks felt they had no other choice. The reason they gave was not that they were forced by MCorp to continue these funding arrangements, but that their future was so intertwined to that of MBanks Dallas and Houston. If the two main MBanks became insolvent or even suffered a short-term liquidity shortage, the directors of MBank Odessa wrote in the minutes of their November 2, 1988, board meeting,

"*a run on the banks would be inevitable.* The very commonality of the name MBank would cause wuch [sic] a public perception as that. The Directors, therefore, unanimously concluded that the Bank would receive no protection from refusing to sell Fed funds to the Dallas bank because a liquidity failure of the Dallas Bank would bring about the failure of MBank Odessa."

(emphasis added) [37]

Rather than ordinary loans that resulted in a dilemma, the FDIC characterizes the federal funds transactions to be part of a permanent financing plan for the MBanks. Therefore, says the FDIC, these monies can be treated as contributions to capital within the MCorp system, and thus payments that should be subordinated to the interests of other creditors. This financing plan, though, did not become permanent through MCorp's choice. It was the FDIC and the Federal Reserve, when MCorp sought help in October 1988, that demanded MCorp accept the Standstill Agreement and keep this funding arrangement in place. The only alternative for the MBanks, injection of MCorp capital into the MBanks Dallas and Houston, was prevented by a stockholder suit.[38]

The FDIC's third argument is that the structure of MCorp and the MBanks implies a unitary banking system. Evidence on this point falls into four main categories: First, MCorp directs the MBanks to submit financial data so MCorp may calculate federal income tax on the MBanks as a group. Second, the MBanks participated in common promotions and programs under the "M" name. Third, MBank Dallas personnel maintained personnel records for the staff at all the MBanks. Fourth, several MCorp officers and directors held positions on the boards of MBanks [39] (with

37. A similar discussion is shown by the minutes to have taken place at the November 3, 1988, board meeting of MBank Wichita Falls.

38. As stated previously, another court has already decided that MCorp did not act wrongfully in refusing to inject additional corporate capital into MBank Dallas. *MCorp Financial, Inc. v. Board of Governors of the Federal Reserve System,* 900 F.2d 852 (5th Cir.1990).

39. MCorp officer Peter Bartholow said in a deposition taken by the FDIC that four of the MCorp directors, including Chairman of the Board Gene Bishop, also served on the board of MBank Dallas in late 1988. Bartholow also recalled one director who served on the boards of both MCorp and MBank Alamo. Bishop, in his deposition, said he remembered that as many as seven individuals had been directors of both the boards of MCorp and MBank Houston.

most or all of these arrangements ending in 1988 or early 1989, to eliminate possible conflicts of interest), and board minutes from some of the smaller MBanks indicate a few directors served on the boards of several MBanks at a time.[40] The FDIC does not indicate, however, that any of these practices violate the statutes governing bank holding company operation. *See* Bank Holding Company Act of 1956, 12 U.S.C. § 1841 et seq.

Finally, the Court takes special note of remarks by FDIC Chairman Seidman to the Bank & Financial Analysts Association, in New York on March 28, 1989, the day the Deposit Insurance Bridge Bank takeover of the MBanks was announced:

> "Not all of MCorp's banks are insolvent. Thus we can not take all of MCorp's bank resources to support the losses in its insolvent bank subsidiaries. *We can't treat MCorp's banks as a single operating unit.*"

(emphasis added) Therefore, the Court finds that the MBanks were not a unitary system and that no grounds existed for these banks to be placed on an unequal footing with other creditors.

### D. *The FDIC Insurance Fund*

■ The Defendants are unable to show MCorp acted illegally in the face of its impending crisis. Therefore, under the National Bank Act they are required to satisfy the legitimate claims of all creditors, MCorp included, at the same rate. The Defendants contend this is precisely what has occurred: that all creditors have been paid out of funds of the defunct MBanks Dallas and Houston at the same rates, 80 percent and 78 percent respectively. The difference between the claims of MCorp and those of depositors and other creditors is that those latter claims were supplemented by payments from the FDIC Insurance Fund, so as to make whole the recipients. MCorp's claims were not so augmented.

This concept of allowing the FDIC to reimburse creditors unequally on the basis that it pulls the money from different pockets, as Judge Sanders wrote in *Texas American Bancshares, Inc. v. Clarke*, is troubling. The receiver of a failed national bank owes a fiduciary duty to its creditors to treat them with "strict impartiality." *Texas American Bancshares, Inc. v. Clarke* at 1253 (quoting *Phelan v. Middle*

**40.** The names "Harry Wilmer," "Harry A. Wilmer," or "Hank Wilmer" appear on the director list for the June 15 and August 17, 1988, and the March 15 and 19, 1989, board meetings of MBank Longview; the February 23, 1989, meeting of MBank Corsicana; the October 18, 1988, and February 21, 1989, meetings of MBank Greenville; the October 19, July 20, and June 15, 1988, meetings of MBank Marshall; and the June 28, 1988, and January 24, 1989, meetings of MBank Sherman. The FDIC has also submitted a letter dated August 24, 1988, that identifies "H.A. Wilmer" as the Director of North Texas Banking for MBank Dallas.

The name "Larry Young" appears on director lists for the February 23, 1989, meeting of MBank Corsicana and the October 18, 1988, and February 23, 1989, meetings of MBank Greenville. A "Larry Young" also is on the list of visitors present at the June 28, 1988, meeting of MBank Sherman. The FDIC has also submitted a memo dates November 2, 1988, saying a "Larry Young" had been named the new senior credit officer for MBank Greenville.

"William J. Renfro" appears on the director list for the September 20, October 13, October 18 and October 31, 1988, meeting of MBank Austin. A letter dated October 20, 1988, identifies Renfro as Managing Director of MCorp.

"Rex L. Boyland" or "Rex Boyland" appears on director lists for the June 15, August 17 and December 9, 1988, and the January 20, January 27, February 17, February 24, 1989, and March 15, 1989, meeting of MBank Longview and the June 15, July 20, and October 19, 1988, meetings of MBank Marshall.

A "William B. Ramage" or "W.B. Ramage" appears on director lists for the November 3, 1988, meeting of MBank Wichita Falls and the February 28, 1989, meeting of MBank Odessa. A "Bill Ramage" is listed as present at the October 20, 1988, meeting for MBank Fort Worth, in the capacity of executive vice president. A "Jerry Mechell or "J.L. Mechell" also appears on director lists for these meetings, as does a "Michael L. Dietrich" or "M.L. Dietrich."

"Ann Rhoades," who appears on the directors list for MBank Greenville meetings, is listed as a visitor at the August 23, 1988, meeting of MBank Sherman.

An "R. Lee Clauser" or "Lee Clauser" appears on the director list for the November 3, 1988, meeting of MBank Denton County and the November 2, 1988, meeting of MBank MidCities, but was recorded as absent at both meetings.

*States Oil Corp.*, 154 F.2d 978, 991 (2nd Cir.1946)).

The FDIC objects to the ruling in *Texas American Bancshares, Inc. v. Clarke* on the ground that the FDIC Insurance Fund was not intended by Congress to fully reimburse all creditors of a failed national bank. Toward this end, the FDIC cites three Fifth Circuit cases that it claims uphold its vision of the Insurance Fund. The Court finds these cases are inapposite.

The first case, *NCNB Texas National Bank v. Cowden*, 895 F.2d 1488 (5th Cir. 1990), speaks only to *former* 12 U.S.C. § 1821(i), and its effect on transfer of fiduciary appointments after a defunct national bank is transformed into a federally created bridge bank.[41] 895 F.2d at 1497. The second case, *Gulley v. Sunbelt Savings, FSB*, 902 F.2d 348 (5th Cir.1990), *cert. denied*, —— U.S. ——, 111 S.Ct. 673, 112 L.Ed.2d 665 (1991), addresses how depositors and secured creditors may be granted preference over unsecured creditors in the takeover of a failed savings and loan—not a bank. Accordingly, this case does not even mention FIRREA § 212(i). In the third case, *Campbell Leasing, Inc. v. FDIC*, 901 F.2d 1244 (5th Cir.1990), the Fifth Circuit did state that the FDIC is obligated to protect only depositors, not creditors and shareholders, in its corporate capacity and that creditors may be limited to a pro-rata share of a failed bank's remaining assets. However, this decision deals solely with the rights of a borrower that defaulted on a promissory note to a bank, then filed suit against the bank (after it was put into receivership by the FDIC) over the bank's seizure of the collateral securing the note. The court's decision does not indicate that some of the bank's creditors were made whole by the FDIC Insurance Fund while others received only pro rata payments from the assets of the failed bank.

It has already been held that the FDIC's stated aim in its handling of the MCorp situation, frugal management of the Insurance Fund, does not eclipse the National Bank Act, 12 U.S.C. § 91.

"In our judgment it could not have been the congressional intent, upon balance, to have the fiscal integrity of the deposit insurance fund (which can be adequately protected by other more equitable means) outweigh the policy of equitable and ratable payment of creditors in this manner and to permit the FDIC, whenever it felt its action to be reasonable and to serve to protect the deposit insurance fund against loss, to prefer some creditors over others—paying some in full while others received little or nothing."

*First Empire Bank v. FDIC*, 572 F.2d 1361, 1371 (9th Cir.1978).

In the case at bar, creditors other than the MBanks were reimbursed in full, through a combination of MBank assets and the FDIC Insurance Fund.[42] By mid–1989, $300 million had been disbursed from the Insurance Fund.[43] (Without evidence to the contrary, the Court presumes some of those creditors, like the MBanks, had debts that exceeded the FDIC's $100,000 legal insurance obligation.) Therefore, a preference by the FDIC toward those fully reimbursed creditors is implied. The Court finds this preference violates the express provisions of the National Bank Act.

### E. *MCorp's Substantive Claims*

1. Violation of §§ 91 and 194 of the National Bank Act

MCorp's primary contention is that the actions of the FDIC and the Comptroller in declaring the insolvency of 20 of the 25 MBanks violates §§ 91 and 194 of the National Bank Act. 12 U.S.C. §§ 91, 194. The Court has discussed the merits of this argument at length above and in its preliminary ruling in *MBank New Braunfels v. FDIC*, 721 F.Supp. 120 (N.D.Tex.1989). The Court finds that the Defendants, by making a non-ratable distribution of funds

---

**41.** It should also be noted that in this case the Fifth Circuit applied the pre–FIRREA law, that existing at the time the receivership was implemented.

**42.** The FDIC has admitted this in its Summary of Facts, at p. 9. *See also* Affidavit of Sherwin R. Koopmans, June 12, 1989, at p. 4–5.

**43.** Koopmans affidavit at p. 5.

to creditors, have flouted the provisions of §§ 91 and 194.

### 2. 5th Amendment Claims

The Plaintiffs also argue that the Defendants' conduct in seizing those MBanks that would have remained solvent had their federal funds loans been reimbursed in full violates their rights as guaranteed by the 5th Amendment of the U.S. Constitution. Specifically, the Plaintiffs contend the seizure is a taking without just cause, and that it thus violates the 5th Amendment's Due Process Clause and its Just Compensation Clause. Having reached its decision on other grounds, the Court declines to address the Plaintiffs' constitutional claims.

### 3. Insolvency of MBank Dallas

MCorp also contests the FDIC's declaration of the insolvency of MBank Dallas. This argument, however, is raised in only one of the many briefs filed in this case, the Plaintiffs' Supplemental Brief in Support of Plaintiffs' Motion for Partial Summary Judgment, filed July 30, 1990. Also, the argument is not structured as an affirmative point, but to support the Plaintiffs' lack of injury-producing inequitable conduct. The Defendants have not had opportunity to respond to the argument. The Court thus declines to consider it at this time.

### VI. Conclusion

After exhaustive examination of all evidence presented in this case, the Court finds that MCorp has shown that no genuine issue of material fact exists that would require a trial. The Court hereby grants summary judgment in favor of the Plaintiffs, MCorp and MCorp Financial, and to the Intervenor Creditors' Committee, on their motions for partial summary judgment and the motion to dismiss the Defendants' counterclaim of equitable subordination. The Comptroller's motion for summary judgment is denied.

The Court shall make a bifurcated ruling on the issue of relief. MCorp shall brief the Court on the amount of relief it seeks, including affidavits supporting its claims. MCorp's brief shall be filed with the Court within 30 days of the file-stamped date of this opinion and order. The Defendants FDIC and the Comptroller shall have 20 days after the file-stamped date of MCorp's brief within which to respond, and MCorp shall have 10 days after the filing of any response within which to seek leave to reply. These briefs shall pertain solely to the issue of relief and shall not address the merits of the Court's entry of summary judgment in favor of the Plaintiffs.

SO ORDERED.